JOHN T. GOSS, Appellant, v. J. J. LANIN et al., Appellees.

JOINT ADVENTURES: Rights, Duties and Responsibility of Par-
1 ticipants—Evidence Reviewed. As preliminary to a question of
fact, the rights, duties and responsibility of those embarking in
joint adventures are stated generally, and thereupon evidence
reviewed and held insufficient to show that plaintiff and defend-
ants ever entered into a joint adventure (or partnership) for
the promotion and construction of a railway, and consequently
there was no occasion for the court to consider what the duties
would have been had such relationship existed.

*Appeal from Chickasaw District Court.*—HON. A. N. HOBSON,
Judge.

FRIDAY, APRIL 9, 1915.

ACTION for an accounting. Opinion states the facts.—
*Affirmed.*

*P. H. Paulsen* and *E. A. Morling,* for appellant.

*J. W. Sandusky, Smith & O'Connor, M. E. Geiser, Clary
& Condon,* and *R. Feyerbend,* for appellees.

GAYNOR, J.—This is an action in equity for an account-
ing. The first petition filed was based upon the claim that the
plaintiff and defendants were a co-partnership for the pur-
pose of promoting a railroad in the state of Texas. An amend-
ment was filed to this petition after some of the evidence had
been taken, and this amendment seems to base a right for an
accounting upon the theory that these parties had entered
into an agreement for a joint adventure for the construction
of a railroad in the state of Texas, or if not a joint adventure,
an employment of agency was created and agreed to between
the plaintiff and the defendants.

The plaintiff claims that, by his own efforts and expendi-

ture of time and money, he had acquired information touching the expediency and feasibility of constructing a railroad in the state of Texas between certain points; that he invited the defendant Lanin, to assist him; that Lanin accepted the invitation and that they were to share the fruits of the enterprise together; that they afterwards employed Springer in the matter and he also accepted and entered into the enterprise to assist in the prosecution of it; that the three were to share the profits of the enterprise; that the expenses of the parties in the enterprise should be mutually shared, or paid out of such enterprise; that there was, at that time, a general demand for a railroad connecting the towns of Sterling City, Carlsbad and Water Valley in the counties of Sterling and Tom Green, and it is claimed by the plaintiff that the inhabitants of these communities to be served by this railroad were willing to pay large sums in aiding the construction, and were willing to furnish a right of way free of cost; that all this, plaintiff had discovered before he came in contact with these other parties; that he had made a personal investigation of the situation at his own cost and expense, and had interviewed the leading and influential citizens of that community, from whom he had secured promises of aid in donations and free right of way; that thereafter, it was verbally agreed between the plaintiff and the defendant Lanin that they would undertake to promote the construction of the railroad and that they would unite their services and efforts in such enterprise; that they would jointly visit the territory and would proceed at once to make definite arrangements for procuring the right of way and the bonuses for the construction of the railroad; that, in pursuance of such agreement, plaintiff and Lanin visited the territory and attempted to make arrangements with the citizens of Carlsbad and Sterling City for the payment of certain bonuses, and for certain rights of way for the contemplated road; that, in pursuance of said arrangements they visited said towns, but were unable to secure favorable recognition

from the citizens of San Angelo, a town to be affected by the road, and the matter was temporarily dropped; that, afterwards, the plaintiff visited the community and revived the interest in the road and obtained favorable assurance from the citizens, and got an agreement from them that if he and his associates would construct a railway, they would pay a bonus, together with the right of way; that plaintiff returned and visited Lanin again, and they jointly renewed their efforts and procured certain agreements from the citizens looking towards the construction of the road; that, by the terms of the agreements so made orally with the citizens, a right of way was to be furnished, and a cash bonus paid when trains were in operation upon the road; that, thereafter, it was jointly agreed between plaintiff and Lanin that in order to prosecute the enterprise it was desirable to take in the other defendant, W. J. Springer, and he was accordingly taken in, and he became associated with the plaintiff and Lanin in the promotion and construction of the road, and it was jointly agreed between the three that they would undertake to promote the construction and that they would use their services and efforts to that end, and would proceed at once to make definite arrangements for carrying out the enterprise, which was accordingly done; that plaintiff thereafter procured all necessary information with reference to the building of the grade, and laid such information before the defendants; that the information which plaintiff acquired looking to the building of this road was through his own effort and the expenditure of his money; that thereafter Lanin and Springer conceived the fraudulent purpose of excluding the plaintiff from further participation in the enterprise, and of appropriating to themselves the business and fruits of the enterprise, and thereafter proceeded on their own account to negotiate with a certain railway company to sell to it their interest and rights in the enterprise, and to that end associated with themselves the defendant, Shaffer, without the knowledge or consent of the plaintiff, and did, thereafter, sell and transfer all the

rights and interests acquired in the construction of the road, but concealed from the plaintiff the amount received therefor, but the plaintiff alleges they realized large profits, not less than $30,000.00; that plaintiff has received nothing from said enterprise; that he expended in all the sum of $370.00 of his own money in connection therewith. Plaintiff says that there was never any express agreement between the plaintiff and the defendants, Lanin and Springer, as to the proportion in which the plaintiff and the defendants should share the profits of said enterprise, but alleges that they were co-adventurers therein, and that the plaintiff is entitled to payment of his expenses, and to an undivided one-third interest of the profits arising therefrom, and asks that any share that Shaffer may have in the enterprise be paid from the portion that would otherwise go to Lanin and Springer.

Defendant Shaffer filed first a general denial. Lanin and Springer answered, denying every allegation of plaintiff's petition in so far as he seeks to fix a liability on these defendants for an accounting. Shaffer filed an amendment to his answer, disclaiming any knowledge of plaintiff's interest in the adventure previous to the time the deal was consummated; denies that he had any knowledge of plaintiff's connection with the matter prior to entering into the partnership with the other defendants. Says that he would not have entered into it if he had known of plaintiff's claim; that he expended money and time in pursuit of the purpose, and further says that, if plaintiff had any interest in it, he permitted the defendants to go on and form a partnership with him and to control the enterprise, with the apparent right to dispose of the alleged interest of the plaintiff; that in May, 1909, he formed a partnership with the other defendants for the promoting and building of the railroad, without any knowledge of any interest of the plaintiff therein; that the plaintiff knew that this defendant was expending time and money in the prosecution of the said enterprise, and in no way noti-

fied this defendant of any alleged rights or claims which he
had thereto, and says that he is now estopped.

Upon the issues thus tendered, the cause was tried to
the court and judgment and decree entered for the defend-
ants, dismissing plaintiff's petition. From this, plaintiff
appeals.

1. JOINT ADVEN-
TURES: rights,
duties and re-
sponsibility of
participants:
evidence
reviewed.

The appellant's first contention is that
Lanin and Springer sustained fiduciary rela-
tionships to him, in that they were co-adven-
turers or co-partners with and joint promot-
ers with him in the enterprise here under
consideration. This is a question of fact.

So far as this controversy is concerned, it is immaterial
whether we treat the parties as co-adventurers or as co-part-
ners. In either event, each would be the agent of the other.
While it is true that, at common law, co-adventurers in an
enterprise were recognized in courts only when the element of
partnership was disclosed, and upon proof of the essentials
of a partnership, this is not the law at the present time; and,
although courts in modern times do not treat a joint venture
as identical with a partnership, it is so similar in its nature
and in the contractual relationships created by such adven-
ture that the rights as between themselves are governed prac-
tically by the same rules that govern partnerships. As some
of the courts hold, while a partnership is ordinarily formed
for the transaction of general business of a particular kind,
a joint adventure, as a rule, relates to the single transaction,
although it may comprehend a business to be continued for
a period of years. See *McCreery v. Green*, 38 Mich. 172;
*Alderton v. Williams*, 102 N. W. (Mich.) 753; *Knapp v.
Hanley*, 108 Mo. App. 353 (83 S. W. 1005); *Felbel v. Kahn*,
29 N. Y. App. Div. 270; *Derickson v. Whitney*, 6 Gray (Mass.)
248; *Field v. Woodmancy*, 10 Cush. (Mass.) 427; *O'Hara v.
Harman*, 14 N. Y. App. Div. 167; *Bradley v. Wolff*, 40 Misc.
(N. Y.) 592 (83 N. Y. Supp. 13).

In a joint venture, as in a partnership, fiduciary rela-

tions are created between the parties entering into the enterprise. It is also settled by authority that, as to joint ventures, if no date is fixed by the contract for their termination, the agreement remains in force until the purpose is accomplished, and neither party can end it at will by notice or otherwise. *Green v. Higham,* 161 Mo. 333 (61 S. W. 798); *Hubbell v. Buhler,* 43 Hun. (N. Y.) 82.

It is also held by authority that, where the undertaking involved in the adventure is based upon certain estimates which require expenditure of money and time, and it afterwards develops that without fault of either party more money and time were required than contemplated, to render the enterprise successful, either party may withdraw from the adventure without becoming liable to the other. See *Hart v. McDonald,* 28 So. 169.

These principles are somewhat summarized in 23 Cyc. at page 455, 3d subdivision of a treatise on joint adventures, in which it is said: "Persons united for a common purpose must be loyal to that purpose and each other. None may, without the consent of all the associates, appropriate to his own use the common property, or by any dealing therewith secure an unfair advantage over those interested with him. An advantage or profit secured by one inures to the benefit of all. He must account for a profit . . . on a sale negotiated by him . . . An appropriation of the common property to individual use constitutes conversion, or creates the relation of debtor and creditor between the parties. . . . Parties to a joint adventure have the power and interest of a partner, as to the disposition of the property. A majority vested with full power to determine the scheme for the disposition of the common property becomes the agent of and binds all by its acts."

Where services are to be rendered by one party to the joint adventure, in consideration of a share of the profits of the enterprise, and such services are rendered, he is entitled to recover the value of such services, and may compel an ac-

counting in equity to that end. See *Matthews v. Kerfoot,* 64
Ill. App. 571; *Edson v. Gates,* 44 Mich. 253.

Where a joint venture has been entered into by mutual
contract of the parties, each party must perform the services
which the contract requires of him to be performed, and if
he fails, he is chargeable with the expenses incurred in em-
ploying others to perform the services, to be deducted from
his share of the profits. See *Dow v. Darragh,* 48 N. Y. Super.
Ct. 138.

It is also held that one who fails or refuses to contribute
toward the adventure before any part of the undertaking is
accomplished cannot claim any interest in the profits derived
therefrom, or in the property subsequently acquired by his
associate individually and with his own funds. *Yeager's Ap-
peal,* 100 Pa. St. 88; *Miller v. Butterfield,* 79 Cal. 62, 21
Pac. 543.

It is apparent that, if plaintiff's contention is true, if we
can find support for his contention in this record and can
say from it that the plaintiff and the defendants, Lanin and
Springer, entered into a joint adventure, looking to the con-
struction of this road, with the understanding that the adven-
ture should be carried forward by them jointly and that each
should share in the profits, and that such adventure was under-
taken by them, then each became bound to the exercise of the
best faith in the promotion of the enterprise; that fiduciary
relations were created by the contract, which neither party
could repudiate without the consent of the other, or without
proof of an abandonment of the enterprise by the other. One
party to the enterprise cannot abandon the enterprise for
the others though he may abandon it for himself.

It is true that, if the record discloses that the plaintiff
acquired all the information relating to the enterprise, and
in confidence conveyed such information to Lanin and
Springer, with a view of securing their efforts in a joint enter-
prise with himself in the building of the road, and that they
entered with him into such enterprise, they would be disquali-

fied to acquire interests which would be antagonistic to the plaintiff, or which would hinder him in accomplishing the object for which he imparted such information. See *Trice v. Comstock,* 121 Fed. 620; *Phyfe v. Wardell,* 5 Paige Ch., 268; *O'Neill v. Otero,* 113 Pac. 614.

This brings us to the record before us to inquire and determine therefrom whether or not Lanin, Springer and the plaintiff did enter into a joint venture looking to the construction of this road. Until this be found in plaintiff's favor, until it affirmatively appears that these parties entered into a joint enterprise substantially as alleged by the plaintiff, there is no occasion for us to consider what the duties would be had such relationship existed. The duties which the plaintiff claims these parties owe to him rest entirely upon the initial proposition that they were engaged in a joint enterprise with him in the promotion of this road.

It is true that it is not necessary that there should be a specific formal agreement to enter into a joint enterprise, or that the interests of the parties should be definitely settled in such agreement, or that there should be a formal agreement as to sharing in the profits. If there be a joint enterprise proven, either by direct evidence of a mutual agreement to that end or by proof of facts and circumstances from which it is made to appear that such enterprise was in fact entered into, the law fixes their rights. See *Jackson v. Hooper,* 76 N. J. Eq. 185 (74 Atl. 130); *Jones v. Walker,* 101 N. Y. Supp. 22; *Ross v. Willett,* 27 N. Y. Supp. 785 (76 Hun. 211), in which it is held, in substance, that a joint venture may exist where persons embark in an undertaking without entering on the prosecution of the business as partners strictly, but engage in a common enterprise for a mutual benefit and have a right to demand and expect from their associates good faith in all that relates to their common interest. It is a sort of a limited partnership as to its scope and duration, and is governed by the same rules as partnerships. See *Nebraska Power Co. v. Koenig,* reported in 139 N. W. (Nebr.) 839.

As supporting the proposition that, where parties are shown to have been engaged as co-adventurers in a joint enterprise, fiduciary relationships exist, and that each party is bound to the best faith, and that each acts for the other the same as in cases of strict partnership, see, in addition to the above cases, Bispham Equity, Section 93; *Trice v. Comstock,* 121 Fed. 620 (61 L. R. A. 176); *Nebraska Power Co. v. Koenig, supra; Grumley v. Webb,* 44 Mo. 444 (100 Am. Dec. 304); *Rose v. Hayden* (Kans.) 10 Pac. 554; *Walker v. Bruce,* 97 Pac. (Colo.) 250.

Plaintiff, in his petition touching the alleged joint enterprise or adventure, alleges that he visited the territory in question in February, 1909, in the prosecution of his personal business, and there discovered that there were several thriving towns in the counties of Sterling and Tom Green, which were wholly without railroads; that there was a pressing demand for railroads connecting the towns of Sterling City, Carlsbad and Water Valley with San Angelo, a station on the A. T. & S. F. Railroad; that the citizens who would be benefited by the construction of such road were willing to pay large sums in aid of such construction, and were willing to furnish rights of way free of cost, and that such line of road would be desirable and profitable property, and that the promotion and building would be a profitable enterprise. That he thereupon visited and communicated with many influential citizens and secured from them a promise in the form of cash donations and free rights of way; that thereupon he orally promised the citizens that he would take up with his associates the matter of constructing the road between said towns and would procure such associates to visit said community, with a view of entering into definite arrangements for the building of the road; that on or about the 15th day of March, 1909, in pursuance of the foregoing understanding with the citizens, he interviewed these defendants, Lanin and Springer, and informed them of the conditions and of the enterprise in which he desired to embark, and verbally

notified Lanin and Springer to associate themselves with him in the prosecution of the enterprise; that they verbally agreed with him that they would jointly undertake with him to promote the construction of the road, and that they would unite their services and efforts in such enterprise, and that they would jointly visit the territory and would proceed at once to make definite arrangements for procuring the rights of way and the bonuses; that, in pursuance of such arrangements, plaintiff and defendants, Lanin and Springer, visited such community, but were unable to procure favorable consideration of their proposition to build, and the matter was temporarily dropped; that later, in April, 1909, plaintiff visited the territory alone and revived the interest in the enterprise. He returned to Iowa, invited Lanin and Springer to join him, and thereupon it was verbally agreed between them that they would jointly renew their efforts in the promotion of the enterprise and would again visit the territory; that in pursuance of such later arrangement they all visited the territory and did procure definite oral agreement from the citizens to donate cash to the enterprise to the amount of $118,000.00, and further donated a right of way; that this was procured by the joint efforts of plaintiff and defendants, Lanin and Springer; that by the terms of said donation, the right of way was to be furnished immediately and the cash bonuses were to be paid when trains were in operation upon the road; that later this oral agreement was reduced to writing. Thereupon, it was verbally agreed between the plaintiff and Lanin and Springer that they would interview the managing officers of the A. T. & S. F. Ry. Co. They did visit said officials and then it was agreed between plaintiff and Lanin and Springer that they would undertake to arrange for the construction of the grade; that, in pursuance of such agreement, plaintiff investigated and procured information with reference to the building of the grade, and that such information was laid before the defendants, Lanin and Springer; that there was never any express agreement be-

tween the plaintiff and the defendants, Lanin and Springer, as to the proportion in which the plaintiff and said defendants should share the profits of the enterprise, but alleges that, by reason of the premises aforesaid, they became and were co-adventurers in such enterprise.

The plaintiff, in an amendment to his petition, alleges that it was the understanding and agreement between them that their expenses and the expenses of all the parties in the prosecution of the enterprise should be mutually shared or paid out of the proceeds of the enterprise; that up to the time that Lanin and Springer conceived the fraudulent purpose of excluding the plaintiff from further participation in the enterprise, they were acting as the agents of the plaintiff, as well as of the three jointly, in the prosecution of the enterprise, and so held themselves out to the plaintiff, and so conducted themselves as to lead the plaintiff to so believe, and the plaintiff did believe that they were acting for and in behalf of himself as well as themselves in the joint venture; that Lanin and Springer betrayed their trust and appropriated to themselves the plaintiff's business, and the fruits of the enterprise and of his labors and expenditures.

It appears from the record that one Gardner, who lived in Waterloo, Iowa, owned, or had an option on a large tract of land to be beneficially affected by the construction of this road; that he had this land for sale in the market; that plaintiff, John T. Goss, E. E. Brady and G. E. Brebner were in the real estate business and were the agents of Gardner in the disposition of this land, and were selling it for him on a commission. The company in which Mr. Gardner was interested was known as the National Realty Company. It appears that in February, 1909, plaintiff, Goss, was in the vicinity of this land of Gardner's and discovered not only a demand but a necessity for a road such as he says was contemplated in the joint venture, and plaintiff says that Gardner was interested in the building of this road to the extent that, if the road was built, his (Gardner's) land would sell much

easier. Gardner's interest in the deal seems to have been to that extent active, and, we assume, one of the moving causes of Goss's activity at that time.

There can be no question from this record that Goss at this time was very active in seeking to promote the building of this road. It appears that he talked with the citizens of Sterling City on his first trip, and sought to interest them in the building of a road. He made, however, no definite arrangements, but had suggestions of bonuses and rights of way. He interested men who had either public or private interest in the construction of this road. That these men with whom he talked desired to carry out this enterprise is apparent. Goss claims that, when he discovered that the people of the community were anxious for a road and were willing to contribute something to its building up, he told them that he knew a man who was familiar with that line of work, a brother-in-law of his, J. J. Lanin, the defendant herein, and that he would bring him down, and told them, as he says, that he and Mr. Lanin would build the road if proper arrangements for bonus and right of way could be made. This was, he claims, about the last of February, or the 1st of March, 1909. He claims that when he came home he talked with Lanin about it, and with several other fellows around Waterloo and New Hampton; that Lanin and he were, at that time, working land business together. He claims that, on or about the 15th day of March, 1909, they started from New Hampton in a private car with Mr. Brady, Mr. Gardner and Mr. Brebner. He says that the occasion of their going down at that time was that they had a party of land seekers who were going down to look over the country, possibly to buy land. Gardner furnished the private car. Gardner was interested in the land down there. He was making up a party of land seekers. This is the first time Lanin went down. He introduced Lanin as a promoter and builder of railroads. Lanin was his brother-in-law. He told them that Lanin was there to enter into a deal to build this road; and he

talked with many people who were interested in the construction of the road. Had public meetings. Called at the banks and tried to interest the bankers. Got a promise from certain parties to contribute certain sums to the enterprise. After Lanin had examined the matter and had been conspicuously introduced as railroad promoter and builder, he was greatly pleased and said the thing to do was to go back home and organize and come down again and meet the clubs. Lanin thought it would be advisable to go home, consult an attorney and come down and meet these people and get them to make definite offers of bonus and then the road might be built. They figured on the cost of building the road, the cost per mile to grade, what the steel would cost, etc. After they got home, they decided to go down again. Arranged to have a Mr. Sullivan of Waterloo to go along with them to take care of the legal side of the question. On this trip Mr. Gardner also went. Sullivan was Gardner's attorney. They had meetings with the citizens. The people were not prepared to make a proposition. They had not taken any action with reference to that, but expressed themselves as willing to do the right thing. "I asked them for a fixed bonus of $100,000.00." This was at San Angelo. He claims that they had definite assurance from the other towns, but the committee of San Angelo turned the proposition down. When they returned from this trip, he claims there was some talk about interesting the Santa Fe Road in the enterprise, and about putting the proposition up to Mr. Ripley, the president of the road. At this time, there had been some talk about bringing in W. J. Springer. Lanin suggested this, and Lanin suggested that Springer would be the man to send to Chicago to interview Mr. Ripley. He said, "I afterwards met Springer and talked the matter over with him and explained it in detail. Talked about the matter of going to see Ripley. I didn't know Ripley at all. Only knew he was president of the Santa Fe. We all agreed that Springer should be taken in." Springer first required that his expenses be paid to Chi-

cago. He said that if he took hold it was necessary that he have his expenses advanced, but plaintiff claims that he told Springer that he wouldn't advance any expenses. Brady was present at this conversation. Springer went to Chicago and after he returned, he took up the proposition with reference to his meeting with Ripley. He said it was favorable. "When Springer returned, Mr. Brady, Mr. Gardner, Mr. Lanin and myself were present with Springer, together with Mr. Brebner. This was about May 8, 1909. The proposition to Ripley was, that they would put in the road bed and turn it over complete and that Ripley was favorable to the purchasing of it." It seems that none of the parties had any money to be invested in the enterprise except Gardner, and Gardner was not willing to put any money in. They talked about financing the road, that it was necessary to get $18,000.00 or $20,000.00 to go ahead with the deal, to put in the road bed; that it would be necessary that they interest outside capital in order to go on; that they consulted with several capitalists. He claims that he also met a man by the name of Elsie, a large contractor, and made a proposition to him to put on the grade. He says that he explained to Elsie that he should be taken in as a partner on the bonus money, or, in other words, that he would get $50,000.00 for putting the grade on; that this would come out of the bonus money, and then on the profits, he would be in on that too. He said, "After this, I wrote to Mr. Lanin at Devils Lake, North Dakota, and I explained the audience with Elsie and told him that Elsie was willing to go in if we could show him that Ripley would do his part, and asked him to come and see me and we would arrange with Elsie. The next I heard of this proposition was when I was down at Sterling City and saw Lanin, Springer, and Shaffer there on this road deal."

Goss further testified in substance that on the 6th day of May, 1909, Lanin wrote him a letter in which he said that he had taken the railroad matter up with Springer, and that Springer said that if Gardner wants to put up $20,000.00, he

will get it back when the line is finished; that he thinks that Gardner's land will sell at a much better price, and that he won't lose anything; that his expenses will have to be paid from here and back; that he said that he had spoken with Springer about plaintiff's proposition, and that he thought it was all right and to go ahead; that he would go to K. C. and see Stillwell, if the President of the Santa Fe would answer his letters, and then stated, "Now if you can get Gardner to do this, we will go ahead and put this deal through, and then we all can make some money. If not, we might just as well drop it; that Springer was the only man that could handle the deal and make it a winner, and that he would suit Gardner and yourself and Brady. It is up to you (meaning Goss), to see whether this goes through or not. You started it. Keep the people in Texas on the string anyway. Telegraph Graham and see what he has to say. Tell him we are going back to put through the road. See Mr. Gardner and tell him all we want is enough to get a start. We must know at once. I got Brady's message."

Goss says, "When I received this letter from Lanin in which he asked Gardner to put up $20,000.00, I talked with Gardner about it. He wasn't inclined to go into the deal if we turned down Mr. Sullivan. He said nothing about his ability to produce the money. I took up the matter of assisting in promoting this enterprise with a contractor at Marshalltown. This was about the 24th of May."

On cross-examination, he stated, "It was in the early part of May I made definite arrangements with Lanin and Springer to put that project through down there. We then made a definite arrangement that we would go in together and put this enterprise through. The first I knew that Shaffer had connection with the enterprise was when I saw him in Texas in the early part of June. I saw the other two defendants there also. I didn't talk with Shaffer about the railroad project although I knew what the three

were there for. I didn't have any conversation with Shaffer at all. Neither myself, Mr. Lanin or Mr. Springer had any means at the time to construct a railroad or to construct the embankment or grade of a road. We had no financial means. The last time I was in Texas with Mr. Lanin was in April. At that time Sullivan and Gardner were along. During these negotiations I talked with a Mr. Marsh about putting some money in. I assured him we could get the deal through if we had money to get the grade started. Mr. Gardner was interested to the extent that he wanted to see the railroad built for the reason that it would give his prospective buyers to understand that they would have a railroad close to the land. He had the exclusive option on the land. He had a lot to say about spending money trying to sell. Mr. Gardner was very anxious that this railroad be built and encouraged me to go ahead and do what I could and informed me that if I wanted any help he would lend me all the assistance possible. My connection with Mr. Gardner was that I was soliciting buyers for his Texas land, and in the event of sales I was to get a commission.''

Brady testified for the plaintiff: ''Mr. Goss went to New Hampton and met Mr. Lanin. He was soliciting land over there, getting buyers for Texas. I didn't meet Lanin until I met him in Texas. This was sometime in March. On the train that took us down there was Mr. Goss, and his brother, several others from New Hampton, myself, Mr. Gardner and Mr. Brebner. I went to New Hampton with Mr. Goss. It was sometime in May. Mr. Lanin said to me and Mr. Goss that they wanted expense money to carry on this, to pay their expenses for going down to Texas and looking after promoting this road. Mr. Goss said there was nothing doing in any way of expense money. Lanin said he had a talk with Springer about the railroad matter. On that day I also met Springer in his office. Both Lanin and Goss were there. There was conversation at the time in regard to this railroad

proposition. Mr. Goss made the proposition to Mr. Springer in regard to somebody's building this road. Mr. Springer stated that there was an attorney who was a good friend of his, and he could get a hearing with Mr. Ripley, the president of the Santa Fe. Springer went to Chicago and after he returned he said he had met Ripley. Had a nice interview and Ripley said that if they got the right kind of contract in Texas that he would equip the road with steel and ties and put on a train. There was talk about raising money to finance it. Some talk about getting Gardner to put in the money. There was some talk about interesting a railroad contractor in the enterprise.''

Most of Brady's testimony appears to be what Goss told him.

Brebner, called for the plaintiff, testified substantially the same as Goss and Brady to the effect that Goss had visited Texas and the vicinity of the proposed road some time before March, 1909, and came back enthusiastic over the proposition to put in a road. He mentioned several parties who he thought might be interested, but in different ways. He mentioned his brother-in-law, Lanin, a good man to promote, and one Marsh, a good man who might finance it. ''At this time I had not met Lanin. In March we took a trip to Texas. In the party were Goss, Lanin, Brady, Gardner and myself. We were taking land buyers into Texas. That is, the National Realty Company was taking land buyers to Texas. When we got there, Goss introduced Lanin to several parties. Mr. Lanin was represented as being a railroad promoter, and it was represented that he was there for the purpose of interviewing parties with that purpose in view. When we got ready to return, Goss wanted Lanin to remain, but Lanin wouldn't remain without Goss. Goss then remained. I heard conversations after that in the office of the National Realty Company. I heard conversations with relation to this road matter. The conversation was between Mr. Goss and Mr.

Lanin, Mr. Springer, Mr. Gardner and Mr. Brady. The talk was that the railroad could be put through but the principal obstacle in the way was that of financing it. I commenced working for the National Realty Company in 1908, as general office man, keeping the books, etc. When I went down to Texas in 1909, I went for the National Realty Company. Most of the persons who went were prospective land buyers.''

Sullivan testified for the plaintiff that the first time he met Lanin was on the trip to Texas in March; that it was understood that Lanin was to pose as a railroad builder and contractor.

It was understood that each one was to be lined up for a part. Lanin was to be the man who was to look over the ground for the purpose of taking the contract for building the road. The people down there understood that Goss was to bring some people to build this road, provided the proper bonuses could be had. A public meeting was called. Lanin made a statement which created trouble. He said that he had nothing to say, no statement to make because the people wouldn't be able to fulfill their contract. After the thing got quieted down, Sullivan made a speech explaining Lanin's attitude, and saying that Lanin meant by what he said that he couldn't make any statement until a definite proposition was made by the citizens. ''I was taken down there for the purpose of addressing these meetings, and for the purpose of looking over the situation, and was given an opportunity, if desired, of becoming one of the promoters. Goss gave me my ticket for transportation.''

Gardner, called for the plaintiff, testified: ''Mr. Sullivan was asked to go down on this trip in March by Mr. Goss and myself. I was interested in seeing it go through. They were asking me to put up some money in order to assist them. I objected to Mr. Springer's taking Mr. Sullivan's place. I was always interested in seeing the road go through as it would enhance the value of our land. I did not know as to

whether I had any interest in the business profits that there might be from promoting it. I thought if there was a profit in it, we would all participate. There was some conversation early in this deal in which Mr. Springer wanted me to advance $500.00 as a fee. That was talked over. My understanding was, that it was a retainer fee. They wanted that as retainer before he began. Mr. Goss talked with me about advancing $500.00 and if I recall, Mr. Lanin was present. I am quite sure there was some question made of a $500.00 fee when Lanin and Goss were present. That was at the time there was talk of taking Springer in. That was the time Lanin was trying to get Springer into the deal. This was before Springer went to Chicago.''

It will be noticed from all this testimony that in nearly every conversation referred to by the witnesses, Gardner, Brady and Goss were present, sometimes Brebner and sometimes Sullivan; that all these parties, in one capacity or another, represent the National Realty Company; that the National Realty Company were the owners or had options on large tracts of land to be affected by the proposed railway. The apparent interest of Brady and Gardner and Sullivan, and we think Goss, was to secure the building of this railway for the purpose of enhancing the value of the real estate controlled by Gardner as the representative of said company; that Goss was interested in the sale of this land, as was also Brady; that the building of a railroad would have the effect of making these lands more valuable, more marketable, and, therefore, bring a benefit to these promoters.

In viewing the situation as presented by the plaintiff's testimony, we must look at it from the standpoint of the probable motive which prompted the interest and activities of these parties; the purpose they had in view in what they did and what they said; the end that they had in mind in the promotion of this road. Each of these parties had the same knowledge of the conditions existing there, and of the advan-

tages to be derived by themselves and the citizens from the construction of a road at the contemplated point. All took an active part in an effort to secure someone who would assume the responsibility and the hazards attending such an enterprise. None of these parties, however, were willing to contribute any financial aid to the success of the enterprise. Gardner, while he desired the road, evidently did not feel confident that there would be profit to the investors in such an enterprise. Goss was in close touch with Gardner. He knew Gardner's mind and Gardner's purpose. He was working for Gardner's interest. This is shown by his own testimony. They sought to interest many parties other than these two defendants in this enterprise. Nothing definite came of any of the interviews, and no financial aid for the enterprise was secured by any one of these parties at any time. They were asked to contribute to the expense of investigating the matter, and to the end that some definite contracts and arrangements might be made to insure its success. This was declined.

It is not claimed by any witness that any definite arrangements were made, either in word or by act, between Lanin, Springer and Goss, that they should, in fact, or that they had, in fact, entered into a joint adventure looking to the construction of this road. The most that the testimony reveals on this point is an assumption on the part of Goss and his witnesses that such an arrangement had been made. It rested on no substantial basis disclosed by the evidence. The most that can be claimed is that there was talk as to investigating the feasibility of such an enterprise.

The plaintiff claims that the arrangement, if made at all, was made about the first day of May, 1909, soon after the meeting with Springer, and that Springer's trip to Chicago to visit Ripley was made in pursuance of the contract to enter into a joint adventure and looking to the carrying out of such adventure. The plaintiff says that on or about the first day of May, 1909, the defendant orally represented to the

plaintiff that, in order to prosecute the enterprise successfully, it would be desirable to invite in the defendant Wm. J. Springer to be associated with them in said enterprise, and at the special instance and request of the defendant Lanin, on or about said date, they invited Springer into the enterprise and to become associated with them in the promotion and construction of the railroad, and that the defendant Springer verbally agreed to associate himself with the plaintiff and the defendant Lanin in the promotion and carrying out of said enterprise, and it was verbally agreed that the three would jointly unite to promote the construction of said road, and would unite their services and efforts to that end, and would proceed at once to make definite arrangements for the promotion of the road. Yet plaintiff claims that after that he invited Elsie in and promised him a share in the profits; that he invited a contractor at Marshalltown to come in and share in the profits.

On the 24th day of May, the plaintiff wrote to the defendant Lanin, addressed to him at Devils Lake, North Dakota, a letter in which he said, among other things, "Neither Springer nor Sullivan are anxious to go into the deal and take any chances. Neither of them want their names mentioned until they are sure it is a go. The fact is, they both want someone out on the advance line to take the blunt of everything, and if it pans out all right, they are ready to take the money and if it falls through, they are protected." From which it is apparent that at that time the plaintiff did not consider that definite arrangements had been made between himself, Springer and Lanin to carry on the joint enterprise for their joint benefit. In that same letter, he mentions Gardner as interested in the deal but unwilling to finance it. He mentions Brady as though he considered Brady entitled to something out of the deal, and then winds up his letter by saying, "Now there is no use talking, I propose to be in on this money business, if it goes through, as I am the man who got this going. If I can deal with the contractor

(meaning the contractor at Marshalltown), I can do business without the Santa Fe being in at all.''

This seems to be the last transaction or communication that Goss ever had with any of the defendants, or with a view to promote the project.

It appears that soon after this letter was received by Lanin, he received a telegram from Springer and returned to Iowa, and for the first time found that Springer had secured Shaffer, the other defendant, to finance the deal; and, on the 28th day of May, the defendants entered into an agreement of co-partnership for the purpose of promoting this road. The agreement entered into was in writing. It defined the object and purpose for which they associated themselves together; assigned to each a definite work and a definite position in the partnership; that all contracts entered into, all money paid to carry out the project, should be approved and concurred in by all the parties. Shaffer agreed to finance the deal and agreed to furnish $20,000.00 in the event satisfactory agreements were made with the Santa Fe to take over the road when completed.

It appears that no definite arrangements had been made with the Santa Fe looking to that end, up to that time. After the contract was entered into, Springer, Shaffer and Lanin went to Texas to look over the project and determine the advisability of entering into the prosecution of the work; that while down there they met the plaintiff. Plaintiff was introduced to the defendant, Shaffer. He knew what they were there for and made no objection and no complaint. They were there probably, at that time, about two weeks. Shaffer advanced all the expense money.

There is evidence that, when Springer was first approached with this proposition, he said that he would not go into it with those other parties, and wouldn't go to Texas for them or with them, unless there was $500.00 put up to cover the expenses. There is evidence of the fact that Springer said, at the time that he was approached with this proposition,

that he wouldn't go into the proposition of promoting the road there at all until he had gone to Texas and investigated the situation, and that he wouldn't go and do this unless his expenses were first secured. There is evidence that the plaintiff never mentioned to Springer anything touching his attempted relationship with Elsie, or the contractor at Marshalltown.

There is evidence that, when Springer said that he would not go to Texas to investigate the matter unless his expenses were paid, it was understood then that Brady and Goss would furnish the money; that they never sent the money; that the plaintiff, after the conversation with Brady, said, "We cannot raise the money. The deal is off," and Lanin said, "All right, I am going to North Dakota," and he went.

There is evidence that Springer never receded from his position and statement that he would not go on and investigate the matter or engage in an investigation until expense money was advanced. There is evidence that no definite agreements were made either for rights of way or bonuses with any of the parties in Texas, interested in the construction of the road, at any time prior to the organization of the defendants' partnership.

There is no evidence that the plaintiff or anyone associated with him, prior to the organization of the defendants' partnership, ever made any definite arrangements with the citizens or committees in Texas interested in this road, looking to its construction. There is evidence that plaintiff never contributed anything of his own to the financial support of the venture; that no one was procured by the plaintiff to give the venture financial support. There is no evidence that he did, there is substantive evidence that he did not, seek to assist, by his own efforts, or by the contribution of financial support, the perfecting of the deal in securing contracts and rights of way; that although he knew that the defendants were engaged in that enterprise in Texas, he made no offer to assist and made no complaint of their attitude. After the deal was

consummated, he procured Mr. Sullivan, the attorney, to write Lanin touching his (Goss's) interest in the deal. There is no doubt that this letter was written at the instigation of Goss, although he disclaimed the attitude in which the letter places him. The letter is as follows·

"Waterloo, Iowa, Oct. 2, 1909. Mr. John Goss and Jean Brady of this City have placed their claim of $5,000.00 against you with me with instructions to commence suit upon the same. They advise me that they had an understanding with you that you were to pay the $5,000.00 for their services in the promotion in the line of railway from San Angelo, Texas, to Sterling City, and they advise me that you have failed to pay the same according to your contract, and unless you forward me draft for this amount, I will commence suit for collection of same.

"I also hold a claim myself for $700.00 for legal services against you in assisting in the promotion of this railway and assisting in getting bonus subscription in San Angelo, Water Valley, Sterling City and Karlsbath. Kindly also forward me draft for $700.00 to cover amount of my bill for services. Please give this matter your prompt attention and save costs."

This letter would indicate the mental attitude of Goss towards the proposition, as he understood it, at the time this letter was written; and it is apparent that he did not then consider himself as a joint promoter or as a co-partner of these defendants. It seems that he then thought that he was entitled to compensation for the services which he rendered, in connection with Gardner, Brady, Brebner and Sullivan, in their early visits to Texas, in which they sought, by their individual efforts, jointly to create a sentiment in favor of the construction of this road; for Sullivan, who evidently understood Lanin's connection with the enterprise and who aided him in the work in Texas, also made claim for $700.00 for services rendered in getting bonus subscriptions.

It is true that, if we accept the theory now advanced by

the plaintiff, this is not a fair construction of the meaning of the letter; but we cannot escape from the conclusion, from a reading of this whole record, that it was never Goss's purpose to place himself in a position where he would be financially responsible for any failure that might attend the enterprise. He seemed to occupy the position in which he said in his letter of May 24th, he found Springer—"He wants someone on the advance line to take the blunt of everything. and if it pans out all right, he is ready to take the money, and if it falls through, he is protected." His theory seems to have been that he proposed to be in on the money business if it goes through, but didn't propose to bind himself to any financial obligations.

Much of the testimony in this record consists of conclusions rather than facts; statements made based upon no personal knowledge of the facts stated; conclusions drawn from inferences as to the existence of facts, rather than from a knowledge of the existence of facts.

We are satisfied, from the whole record, that there was no co-partnership between the plaintiff and Lanin and Springer, and we are further satisfied that they never entered into a contract for a joint adventure in the enterprise; that plaintiff has no standing in court, either as a co-partner or as one engaged in a joint enterprise; that he played a waiting game, if, peradventure, he ever had in his mind at the time the thought of reaping profits from the joint venture. His whole conduct is inconsistent with the theory upon which he predicates a right to recover in this suit. "Heads I win, and tails you lose."

We find no relief for the plaintiff in this record and concur in the conclusion reached by the trial judge. The case is, therefore,—*Affirmed.*

DEEMER, C. J., LADD and SALINGER, JJ., concur.