GLENN WINN et al., plaintiffs; H. C. McGREGOR, substituted plaintiff, appellant, v. RUDY-PATRICK SEED COMPANY, a corporation, appellee.

No. 49299.

(Reported in 86 N.W.2d 678)

432

December 17, 1957.

Camp & Harsh, Thos. E. Mullin and Donald D. Mullin, all of Creston, for appellant.

J. D. Reynolds, of Creston, and R. E. Killmar, of Osceola, for appellee.

Smith, J.—Plaintiffs, Winn and Gillespie, bluegrass seed operators ("harvesters" or "strippers") entered into a written contract, dated June 6, 1953, with defendant Rudy-Patrick Seed Company, of Kansas City, Missouri. By it they agreed "to harvest, cure and supervise the operation and ship the cured [bluegrass] seed" to defendant. Defendant was to advance funds "to cover cost of the seed." Though the contract does not expressly so provide, plaintiffs were not producers but were to buy the rough seed on the market wherever they could find it, using the funds so advanced by defendant, and defendant was to thresh and market it. Plaintiffs were to carry insurance coverage until delivery of the seeds to defendant.

Threshing was to be done at 35¢ per bushel, interest on unpaid balances paid at 5½% per annum, selling and handling on $1.50 per 100# "basis clean seed" and bags furnished by defendant at 5¢ each, plaintiffs to stand any shortage.

Settlement was to be made on "Rudy-Patrick's average carlot sales price through May 30" and sales of plaintiffs' seed "prorated against Rudy-Patrick total carlot sales." If funds advanced by defendant proved "greater than those realized from sales of the seed or if carried into another crop year, those monies

advanced in excess" were to be paid defendant by May 30 "unless other arrangements are made with Company."

The contract was to be in effect April 30 of each year and be continuous "unless one Party notifies the other thirty days in advance of his intention of termination." Plaintiff Winn signed as of Adair, Iowa, Gillespie as of Orient, Iowa, defendant "by Roy A. Edwards, Kansas City, Missouri." The contract was in operation only during the 1953 season though no termination notice is shown to have been given.

Plaintiffs' petition, filed June 24, 1955, alleges that pursuant to said contract they "procured, dried and shipped * * * a large quantity of rough bluegrass seed"; that on December 9, 1953, "an alleged accounting sheet was mailed to plaintiffs" but that it "failed to account for all the seed shipped * * * and failed to credit plaintiffs with the average carlot sales price that defendant received for the plaintiffs' seed"; and that it "charged plaintiffs with an excessive amount of interest on the different monies advanced to them * * * and failed to provide them with a complete threshing record."

After its special appearance and later motion for more specific statement were overruled, defendant answered, admitting execution of the contract and alleging plaintiffs had shipped it 187,448 pounds of rough bluegrass seed during the summer of 1953 and that "a full, final and complete settlement" had been made between the parties.

In a second division defendant elaborated that on November 30, 1953, it furnished plaintiffs "a complete breakdown and itemized statement showing the number of pounds of bluegrass received", the total value of same "pursuant to the terms of the contract" and a recapitulation of the threshing operations which showed "there was a final net amount owing plaintiffs of $8720.18"; that on or about November 18, 1953, plaintiffs were advised by mail the threshing would be completed November 30, and they were asked to come to Kansas City for settlement; that plaintiffs asked to have the account carried over until January or February 1954, and payment made thereafter.

Defendant further alleges the sending of a check for $8720.18 by registered mail "on or about June 30, 1954", that same was cashed, that there was a complete settlement and that

plaintiffs are estopped to proceed with this case. As a matter of fact the check was dated June 2, 1954, but held and not cashed by plaintiffs until on or about August 23, 1954.

We are not clear from the record at just what point the substitute plaintiff became the owner of plaintiffs' claim (by judicial sale) but the order was made November 20, 1956, by which H. C. McGregor became substitute plaintiff. He now stands in plaintiffs' shoes but we shall continue to use the plural form unless some personal reference to substitute plaintiff becomes advisable. The original plaintiffs had filed a reply on November 7, 1956, and on November 20 an amendment to reply.

These pleadings charged defendant with fraudulent misrepresentations in making the report or statement to plaintiffs "with intent that plaintiffs would rely thereupon." On the latter date (November 20) defendant moved to strike the reply as filed too late and as failing to plead any facts to support the conclusion of false representations or fraud; and as an attempt to plead a distinct cause of action, separate from the original one alleged in the petition.

The trial court sustained the motion saying the ruling was "without prejudice to the rights of plaintiff to bring any cause of action they may have based upon fraud."

Thereafter the substitute plaintiff filed an Amendment to Reply "for the purpose of replying to the affirmative defense of full, final and complete settlement raised by the defendant and not for the purpose of pleading any new cause of action." This pleading alleged intentional, fraudulent misrepresentation by defendant, relied on by the original plaintiffs. There was a motion to strike this amendment to reply but it appears not to have been expressly ruled on.

However, the trial court, apparently assuming the situation was sufficiently clear, permitted the trial to go forward and after its conclusion entered decree dismissing plaintiffs' petition at plaintiffs' cost. This appeal followed.

I. It seems advisable to emphasize at the expense of some repetition the real issue that was tried. It was not an accounting, but a trial to determine first whether plaintiffs were *entitled* to any further accounting in face of defendant's defense of set-

tlement or accord and satisfaction and plaintiffs' reply that same was induced by defendant's actual and constructive fraud in sending the itemized statement on or about the last of November or early in December 1953.

There was no charge of fraud against defendant in connection with its performance of duty under the contract. We agree with plaintiffs' contention and the trial court's holding that the contract created a confidential relationship between plaintiffs and defendant, a virtual joint adventure. Goss v. Lanin, 170 Iowa 57, 61, 152 N.W. 43.

But there is no indication in the record that the settlement was induced by or under the relationship. When the check was finally cashed by plaintiffs the relationship was terminated or became adversary and it may be seriously doubted whether there could have been any constructive fraud in sending the "breakdown" November 30 (or December 9), 1953, when all parties knew the contract and knew that the quoted price, 95.544, could only be based on sales up to the time the statement was sent.

No question or objection was even hinted by plaintiffs when they received the statement, no inquiry as to possible later sales "through May 30", no complaint then or long later, after they received (June 1954) and cashed (August 1954) defendant's check of $8720.18. We can only conclude they understood the language of the contract as did defendant. And we are convinced whatever rights plaintiffs may originally have had were lost by the time their attorneys, on October 28, 1954, wrote asking for "a copy of your balance sheet of the partnership business covering the period from June 1, 1953, through May 30, 1954." 68 C. J. S., Partnership, section 38; Wally v. Heck, 125 Ark. 597, 185 S.W. 444, 446.

II. Out of the confusing web of legal contention (such as only able and earnest lawyers can weave) the factual pattern emerges as we study the language of the contract and the testimony designed to explain its meaning. The contract, with apparent (but deceptive) clarity says: "Settlement is to be made on Rudy-Patrick's average carlot sales price through May 30 and the sales of the Winn and Gillespie seed to be prorated against Rudy-Patrick total carlot sales."

■ We have no doubt of the admissibility of such evidence. As said in 32 C. J. S., Evidence, section 1015: "It is generally considered that parol evidence is admissible where it is offered, not for the purpose of varying the terms of a written contract * * * but for the purpose of explaining and showing the true nature and character of the transaction." See 20 Am. Jur., Evidence, section 1144.

Roy Edwards, the official of defendant who signed the contract, testifies: "All the seed which comes in to us by our own gathering or by the gathering of partners" (meaning joint adventurers such as the original. plaintiffs) "would then be threshed, and the total amount of clean seed resulting from that method would then be used to figure out the amount of seed to go against the carlot sales." He says the seed so procured is what they, in the trade, consider as being the season's crop of bluegrass seed. When it is threshed they do not hold it for speculation but put it into the "channels of trade."

■ This testimony was consistently objected to as calling for the conclusion of the witness and an attempt to vary the terms of the written contract. But those terms needed to be interpreted into terms conveying their real meaning so as to be understood by laymen as they were by professional bluegrass seed men who signed the contract.

Kenneth Devenport, comptroller of defendant-company, was called as witness for plaintiffs to show there were a number of carloads of seed (four, specifically) sold after November at a higher price than the average of 95.54 which, if taken into account, would have materially increased the amount due plaintiffs above the average figure used in defendant's computation.

He interpreted the contract as did Mr. Edwards: "My interpretation is that when all of the seed we had received from bluegrass harvesters or strippers * * * was sold then you would arrive at the average price from those sales. That any seed you might purchase from then on from other processors you handled on a smaller margin and it doesn't come in the same category at all."

He says "to the best of my memory we were through threshing sometime in November. That was a very short period as compared to the average year. Sometimes the threshing period extends up into March of the following spring."

In other words, the agreement was to credit plaintiffs with the average carlot price computed by prorating plaintiffs' season's quantity threshed against the entire carlot sales by defendant of bluegrass seed threshed and marketed by defendant for the entire season.

We have referred to the "apparent but deceptive clarity" of the contract. But we have no doubt from their conduct its meaning was clear to the parties themselves who were men of many years experience in the bluegrass seed business and the manner in which it is conducted.

■■ III.  We find no adequate or substantial, nor even circumstantial, evidence of fraud or misrepresentation by defendant. Its understanding of the contract was apparently shared by plaintiffs until long after they accepted payment. The first symptom of any dissent by them was on October 28, 1954, when their attorneys wrote defendant asking for a copy of the "balance sheet of the partnership business covering the period from June 1, 1953, through May 30, 1954." This was months after they had accepted payment on defendant's accounting.

The law applicable to such a situation is well settled. As defendant in its brief argues, citing 1 Am. Jur., Accord and Satisfaction, section 19, page 222, accord and satisfaction need not be reached by express agreement but may be found in an implied agreement.

We have had some trouble in arranging our decision in orderly form. Nor is it easy to cite cases factually in point. However, we think the record here and the authorities require an affirmance. We find no evidence of fraud, either active or constructive, which induced the settlement or would warrant setting it aside. See Johanik v. Des Moines Drug Co., 240 Iowa 310, 316 et seq., 30 N.W.2d 370.

We make no accounting between the parties because we agree with the trial court's holding that plaintiffs had by their conduct lost the right to an accounting.—Affirmed.

All JUSTICES concur.