## No. 17,250.

### KINCAID ET AL. *v.* MILLER.
(272 P. [2d] 276)

Decided June 28, 1954. Rehearing denied July 19, 1954.

Messrs. GORSUCH, KIRGIS, CAMPBELL, WALKER & GROVER, Mr. WILLIAM C. McGEHEE, for plaintiffs in error.

Messrs. PERSHING, BOSWORTH, DICK & DAWSON, Mr. WINSTON S. HOWARD, for defendant in error.

*En Banc.*

MR. JUSTICE KNAUSS delivered the opinion of the Court.

IN the trial court plaintiffs in error were defendants and defendant in error was plaintiff. We will refer to the parties as they there appeared, or by name. Pearl Kincaid, also known as Pearl E. Kincaid, is the wife of defendant W. L. Kincaid. The trial court having determined that certain assignments of royalty interests made by W. L. Kincaid were solely for his convenience, and made without consideration, and it appearing that W. L. Kincaid was the only party actively participating in the transaction herein considered, we will refer to him as Kincaid. Plaintiff is a geologist and defendant Kincaid is an oil and gas lease broker.

In plaintiff's complaint it is alleged that since 1944 he

and Kincaid had jointly acquired various oil and gas leases and interests in which each party to the joint venture had an equal and continuing interest. In this complaint and in an amended and supplemental complaint plaintiff also alleged that Kincaid had engaged in certain transactions with respect to two of these oil and gas leases which resulted in a secret profit to Kincaid, and plaintiff prayed that Kincaid be required to share with Miller the profit thus made. Reference is made to one of these leases as the Buffalo-043483 lease and to the other as the Wyoming-0588 lease.

By answer, Kincaid admitted that certain joint-venture properties were acquired by the parties, but denied that the leases mentioned were a part of said joint-venture, and alleged that if such relationship had existed with reference to said leases, it terminated prior to the transactions from which he realized profits.

Defendant filed a counterclaim in which he alleged that his assignment of a one-half interest in the Wyoming-0588 acreage lease resulted from a mistake on the part of either plaintiff or defendants or both, or from misleading assertions and misrepresentations on the part of plaintiff, and he prayed that the interest so conveyed be restored to defendants. Plaintiff denied the allegations of the counterclaim. The trial court resolved the issue so presented in favor of plaintiff.

The trial court found from the evidence that since 1944, plaintiff and defendant "have engaged in many joint activities in the acquiring of leases on oil and gas lands." That in 1948 plaintiff and defendant Kincaid jointly obtained leases on some 2556 acres of land in the "northwest Sussex Area" in Wyoming, and for convenience the federal leases on said land were taken in the name of Mary L. Mains who had no interest in said leases except the right to receive one-fourth of one per cent over-riding royalty. In October, 1950 a part of said leased land referred to as Buffalo-043483 was under option to the Bay Petroleum Corporation. On October 5,

1950, Kincaid paid the Bay Petroleum Corporation $4,-712.00, and thereupon the interest of the Bay Petroleum Corporation in some 2300 acres of this land terminated, which land included the so-called Buffalo-043483 lease. Kincaid immediately thereafter caused Mary L. Mains to grant Stanolind Oil & Gas Company an option thereon and Kincaid received for said option the sum of $8,-245.75. Stanolind Oil & Gas Company exercised its option as to 1791.33 acres of land covered by the Buffalo lease and Kincaid caused Mary L. Mains to assign the lease on that acreage to the Stanolind Company. Stanolind thereupon surrendered its option on the remaining acreage. October 10, 1951, Kincaid caused Mary L. Mains to assign this remaining leased acreage (555.43) to himself, Mary L. Mains reserving a $3\frac{1}{2}$ per cent overriding royalty. December 5, 1951, Kincaid caused an assignment from Mary L. Mains of one per cent of said overriding royalty to be made to defendant Pearl Kincaid and $\frac{5}{8}$ths of one per cent of said royalty to be made to his son, Robert L. Kincaid. These assignments covered the entire acreage in the Buffalo-043483 lease.

December 10, 1951, Kincaid entered into a contract with C. R. Cole and McAlester Fuel Company, a corporation whereby, among other things, he assigned to said Cole the lease on the 555.43 acres of the Buffalo-043483 lease, retaining for himself $12\frac{1}{2}$ per cent overriding royalty which included the $3\frac{1}{2}$ per cent above mentioned as reserved to Mary L. Mains. For this agreement Kincaid received $55,543.00 and an agreement on the part of said Cole and the McAlester Company to start drilling for oil on the land on or before June 11, 1953, and to diligently thereafter prosecute said work, or in default thereof to pay Kincaid the sum of $25,000.00 as liquidated damages. The court found from the evidence that Kincaid, out of the moneys so by him received, retained $50,000.00 and an overriding royalty of 5 per cent after all other proper royalties had been deducted.

The court also found that in February, 1944 plaintiff

and defendant Kincaid jointly obtained an oil and gas lease then known as the Cheyenne and later known as Wyoming-0588, in which acreage Superior Oil Company had theretofore expressed an interest. That lease was, for convenience, taken in the name of defendant Pearl Kincaid and in May, 1951, the lease was under a drilling and operating agreement to Superior Oil Company. In June, 1951, Kincaid purchased the interest of Superior Oil Company in the lease for $1,280.00 and immediately thereafter sold an option for an assignment of the lease to C. W. McAlpin for $5,119.75, reserving an overriding royalty of two per cent. Thereafter Kincaid caused an assignment of one-half of said lease to be made to plaintiff. The trial court also found from the evidence that the transactions conducted by Kincaid with respect to the Buffalo-043483 lease and those with reference to the Wyoming-0588 lease all were conducted without the knowledge or consent of the plaintiff and without any division by defendant with plaintiff of the fruits and proceeds received therefrom by him. The trial court also determined that all the assignments of royalty made by defendant Kincaid to his son Robert, and to defendant Pearl Kincaid, his wife, were made without consideration and solely for the convenience of Kincaid.

The trial court held that Miller and Kincaid had an economic interest at all times in the lease acquired by their joint operations; that this interest continued until the joint adventure ended; and that it could not end at the option of only one of the parties, but could be terminated only by the concurrence of both parties thereto.

Each and every one of the trial court's findings of fact is supported by competent evidence in the record of the case.

The court by its judgment and decree awarded plaintiff one-half of the cash and overriding royalty which Kincaid received as a result of the option of the Mary L. Mains lease to Stanolind, as well as one-half of the rights in, and proceeds from, the December, 1951 agreement

between Kincaid, Cole and the McAlester Company. Defendants bring the cause to our Court for review by writ of error.

It is contended by counsel for plaintiffs in error that the transactions with respect to the Buffalo-043483 and Wyoming-0588 leases were individual transactions of Kincaid in which plaintiff had no interest or claim. It is asserted that these dealings by Kincaid were not a continuation of the original joint adventure, but were personal dealings not associated therewith, and that if any joint adventure had existed it was terminated when he dealt with these leases.

It is asserted by counsel for Kincaid that:

"The original sale of an option, operating agreement or assignment covering a federal or state lease was a joint venture complete in itself, and in the event the lease was later relinquished to Miller and Kincaid and they were successful in again selling an interest in the lease, such a second transaction was another joint venture, separate and apart from the original transaction with respect to the lease. Each such transaction in and of itself was sufficient to satisfy all the legal requirements for a complete joint venture and the parties themselves considered each such transaction with respect to a lease a matter for separate discussion and agreement."

This assertion by Kincaid's counsel is refuted by the testimony given by Kincaid himself. We quote from his cross-examination: "Q. At the situation where we now are, in the course of these events, if Bay had exercised the option which Mary Mains had given on this acreage, Mary Mains would have, without any further consideration moving to her, assigned the lease in full to Bay, reserving only one and a half per cent overriding royalty? A. One and a half per cent is what would have been reserved when there was an assignment, that is correct. Q. Is that correct? A. That is correct. Q. In that event who would have been the owners of the one and a half per cent overriding royalty reserved? A. Mary

L. Mains would have had one-fourth of one per cent; David B. Miller, five-eighths of one per cent, and W. L. Kincaid five-eighths of one per cent. Q. Why would you and Miller each have acquired five-eighths of one per cent override in that event? A. That is half of the balance, over and above one-fourth of one per cent. Q. By virtue of what arrangement did Miller and you each get five-eighths of this one per cent override? A. *That is the way we had operated.* Q. That is the way you had always done on these joint ventures, is that right? A. Yes. Q. That, in fact, is the usual arrangement by which you handled ventures of this kind that you had together, is that right? A. That is the usual practice. Q. Carrying forward, suppose the Bay Petroleum Corporation had surrendered its option to acquire this lease from Mary L. Mains, who, according to your understanding of your arrangements with Mr. Miller, then would have been the real owners of the Mary L. Mains lease? A. Mary L. Mains would have been the record owner, but she is the one, the applicant to whom the lease would be reverted. The *actual ownership would have been in Miller and Kincaid.* Q. And *that ownership in Miller and Kincaid would have been in equal proportions?* A. That's right. Q. *In other words, you would have a half-interest in the lease and Miller would have a half-interest in the lease, subject only to a one-fourth override to Mary Mains and to the option to Bay, is that right?* A. Yes. Q. *In the event Bay had surrendered its option on this acreage, what is your understanding of your arrangement with Mr. Miller as to whether or not you would have been in position to try to interest somebody else in taking an option on the acreage?* A. *We would have, if it had been ours to sell, trade or split up, done whatever we wanted to.* Q. In the event you optioned it to somebody else, the consideration that was obtained from that option would have been divided equally between Miller and Kincaid, is that true? A. Yes. Q. In your dealings, yours and Mr. Miller's dealings, you had always operated when you

had joint activities of this general kind, in that way, hadn't you? A. Yes, sir. Q. *Was there any instance, Mr. Kincaid, where, in a situation like this, that is, where a person has filed application for lease which has ripened into a lease, an option has been granted to someone to acquire the lease, and that option has been surrendered and a new option had been given to someone else, has there been any instance in the joint activities of yourself and Mr. Miller in which the consideration moving from the new optionee has not been divided equally between you? A. Not that I know of. Q. It would be contrary to your understanding of your arrangement with Mr. Miller if there were to be any other than an equal division, is that true? A. There was never any arrangement or agreement. It was just a custom that we fell into in early work that we followed through on. Q. But it would be contrary to that what you call 'custom' to do it other than to divide equally, isn't that right? A. Yes, we would divide it equally \* \* \*.*"

This evidence of Mr. Kincaid makes .it abundantly clear that it was the understanding of both parties that in their joint operations: Miller and Kincaid owned the leases as joint adventurers; that after they optioned the leases they continued to own them subject to the option; if the option was surrendered, Miller and Kincaid still owned the leases, but they were no longer subject to the option. The leases belonged to them, as Mr. Kincaid testified, " \* \* \* to sell, trade or split up \* \* \* to do whatever we wanted to."

At another point in Mr. Kincaid's cross-examination we find the following:

"Q. Do you recall, Mr. Kincaid, my asking you earlier, suppose the Bay Petroleum Corporation had surrendered its option to acquire this lease from Mary L. Mains, in your opinion, then, who would have been the real owner of the Mary L. Mains' lease, and you answered that Mary Mains would have been. Do you wish to change that? A. Mary L. Mains was the record owner. Q. Kin-

caid and Miller were the real owner? A. That is a hypothetical question. You asked me if they had done something who would have been the owners, is that right? Q. *Miller and Kincaid would have been the owners in that case, is that right?* A. That is right. Q. *In other words, you had half interest in the lease with Mr. Miller, subject to Mary L. Mains' right to have a one-fourth of one per cent override, isn't that correct? You said that?* A. *That is right."*

The best indications of the nature of the agreement of these parties are to be found in the nature of their business transactions. In this connection we again quote from the evidence of Mr. Kincaid; here is what he said in trying to show why Miller and Kincaid didn't own the Wyoming-0588 lease: "Q. *In the event that the oil company which had a drilling and operating agreement on the lease were to surrender that drilling and operating agreement or option if they had an option, then who would own the lease?* A. *They didn't surrender it, but if they would, as I understand your question, then it would have reverted back to Kincaid and Miller.* Q. And that would be true, no matter what form the surrender took, would it not? A. No, sir. Q. What form would it have to take? A. Well, the way it actually was accomplished, they sold it back to me. Q. In this case you bought it with refundable rents? A. I bought their interest in the lease, subject to the original override of one and one-quarter per cent. I think it is of record. Q. In this case, where you didn't buy them out and where they surrendered the lease back, as you take it to the original lessee, who was the owner of the lease? A. Pearl Kincaid, by virtue of rebuying. Q. That would be true whether it was an operating agreement or an option that they originally had, wouldn't that be true? A. Yes. Q. Who would you say would be the owner, then, Miller and Kincaid? A. If there was no payment, no nothing, who would be the owner? Q. Yes. A. *Pearl Kincaid would be the record owner, but she would be the owner*

*only as the record owner but it would actually belong to Kincaid and Miller.*"

In numerous instances appearing in the record the continuing joint interest of Miller and Kincaid was recognized by divisions of leases between them. In many instances such leases were under option or drilling agreements to oil operators and in the assignments thereof to Kincaid and Miller in equal shares it was expressly stated that they were subject to the option or drilling and operating agreements. When these divisions were made, the result was that Kincaid had a lease on one-half of the acreage and Miller had a lease on the other half thereof subject to the option or operating agreement then existing.

The record contains the history of three transactions in which Miller and Kincaid acquired leases as joint adventurers, in each of which they granted options to oil companies and divided equally the profits therefrom. Later the oil company's interest was in one instance purchased by Miller, the other two being purchased by Kincaid, and in each of these instances the respective parties sold a new option to another oil operator. Significantly, in the single transaction handled by Miller, the proceeds or profits from the sale (being the two transactions here involved), Kincaid did not divide or offer to pay his associate any portion of the profit which he realized.

A careful and painstaking review of this record discloses that there is not a single transaction between these parties which supports Kincaid's theory of the case. In fact his testimony, in so many words, disposes of the argument made by his counsel and when we couple his words with his actions we must inevitably conclude that the joint venture did not cease when an option was taken by, or a lease transferred to, an oil operator. It is abundantly shown that Miller and Kincaid, after granting options on leases, granted new options when the former were not exercised; they divided

562

the profits arising from the sale of new options; they paid rentals on leases and divided leases between themselves; and in other instances surrendered leases to the government. Mr. Kincaid gave no evidence of any transaction in which the parties considered their interests to have ended upon the granting of an option, although he was given ample opportunity to so testify.

■ One of the leading cases on the law pertaining to joint adventurers is that of *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545. In that case Mr. Chief Justice Cardozo, speaking for the Court, said: "Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions (*Wendt v. Fisher*, 243 N.Y. 439, 444 [154 N.E. 303]), Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

■ It is the general rule that until the joint adventure has terminated, or the enterprise has been abandoned, a joint adventurer cannot exclude his associates from an interest in the property by purchasing it for his individual account; neither can he acquire for his individual benefit an interest therein antagonistic to the interest which he acquires for his associate. If he does so purchase or acquire the property in breach of his duty he must account therefor to his joint adventurer.

■ In *Austin v. Stephen,* 89 Colo. 177, 300 Pac. 364

and *Hanson v. Chamberlin,* 76 Colo. 562, 233 Pac. 830, our Court held that where the title to property acquired in connection with a joint adventure is in the name of one of the parties, he holds it in trust for his associates.

■ Joint adventurers stand in a close relationship of trust and confidence and are bound by the same standards of good conduct and square dealing as are required of partners. Each party to a joint adventure has the right to demand and expect from his associates full, fair, open and honest disclosure of everything affecting the relationship. *Moe v. Lowry,* 69 Colo. 371, 194 Pac. 363.

■ Without the consent of his associates no member of a joint adventure may so act that his personal interest is hostile to the interest of another member thereof, so long as the joint adventure continues.

In *White v. A.C. Houston Lumber Co.,* 179 Okla. 89, 64 P. (2d) 908, the court said: "Each case of mining partnership or joint adventure must necessarily be determined by its own facts. However, by examination of cases heretofore decided by this court, we can devise a test consisting of three requirements which must always be present in order to form the relationship: (1) There must be joint interest in the property by the parties sought to be held as partners; (2) there must be agreements, express or implied, to share in the profits and losses of the venture; and (3) there must be actions and conduct showing co-operation in the project." See, also, *Wynne v. Gibson,* 167 Okla. 114, 27 P. (2d) 849.

A well-considered case in which many of the pertinent authorities are reviewed is that of *Whitsell v. Porter,* 309 Ky. 247, 217 S.W. (2d) 311. There the heirs of one Kirkwood owned an undivided three-fifths interest in a certain tract of land which was being sold at a judicial sale. The property contained coal, and the heirs decided to buy the property at the judicial sale. A crude instrument was executed by the heirs in which it was agreed that the property should be bought for all of them. Hart and Hart were designated as purchasers. When the sale

was held Hart and Hart stopped bidding and the defendant, husband of one of the heirs, entered the bidding and was successful purchaser. The heirs contended that they had urged the defendant to bid for them; the defendant insisted that he was bidding for himself only; after the purchase of the land, defendant made it known to the heirs that he had bought the land for himself and that he claimed it. The court held that the defendant held the property as trustee for the heirs, saying: "We agree with the appellant that the evidence is not of that clear and convincing character ordinarily required to support a finding of a constructive trust. However, the relationship of the appellant to the transaction is of the character that but little evidence requires that such a trust be imposed. It is the rule of equity that but slight evidence sustains a claim that a fiduciary has failed in the performance of his obligations to his principal."

Briefly stated, the facts in *Wyoming-Indiana Oil & Gas Co. v. Weston*, 43 Wyo. 526, 7 P. (2d) 206 were: Plaintiff, acting as an agent for his coplaintiff corporation entered into an oil agreement with the defendants Weston and Walls. In this agreement it was provided that all of them should obtain a state oil and gas prospector's lease to be held in the name of Weston. The lease was obtained in 1920. During the term of the lease it was mutually agreed that plaintiff, in consideration of his spending certain money in the development of the lease, should have an additional 2/9ths interest. He then had a total of 5/9ths interest. He paid his proportionate share of the rentals from 1920 to 1923. The lease was renewed in 1924 and thereafter defendant agreed with a Mrs. Hogg that she should have a 1/5th interest therein for paying the 1924 and subsequent years rentals. Plaintiff acquiesced in the arrangement. Mrs. Hogg paid the rentals through 1927. No demand was made upon plaintiff for any part of the rentals. In 1927 Weston told plaintiff that plaintiff no longer had any interest in the lease. It appears that sometime prior to this notification,

plaintiff had entered into an operating agreement with the Continental Oil Company, which drilled a well and produced oil from the property. Plaintiff contended that the proceeds accruing to Weston or Walls from the well should be held in trust and that plaintiff was entitled to his pro rata share thereof.

Defendant contended that there was no proof of joint venture and that no written agreement had been established. The Supreme Court of Wyoming disposed of that contention by quoting from *Goss v. Lanin,* 170 Iowa 57, 152 N.W. 43, the following: "It is true that it is not necessary that there should be a specific formal agreement to enter into a joint enterprise, or that the interests of the parties should be definitely settled in such agreement, or that there should be a formal agreement as to sharing in the profits. If there be a joint enterprise proven, either by direct evidence of a mutual agreement to that end or by proof of facts and circumstances from which it is made to appear that such enterprise was in fact entered into, the law fixes their rights."

In *Wyoming-Indiana Oil & Gas Co. v. Weston,* 43 Wyo. 526, 7 P. (2d) 206, it was contended, as here, that the joint adventure had ceased to exist because no legal right of renewal existed as to any of the leases involved. The court disposed of this contention in the following language: "But this argument lays out of view both the underlying agreement of joint adventure proven, whereby the parties were to share proportionately in profits resulting from their procurement of new leases on the state land involved over a period of years, and the legal duty resting on co-adventurers of preserving the utmost good faith in their dealings with each other * * *. The leases taken each year were identical in form with the exception of the necessary change in date * * *.

"It is equitable that all whose capital and services were thus contributing factors in obtaining the lease should share proportionately, as agreed."

Counsel for Kincaid rely on *Gillan v. Stansbury,* 97

Cal. App. (2d) 502, 217 P. (2d) 1016, decided by the California District Court of Appeal of the Second District. The facts in that case are not comparable to those in the instant action, and we do not think it is authority for the position taken by counsel for plaintiff in error. The testimony of Kincaid herein set forth presents an entirely different state of facts than those disclosed in the Gillan case.

We see no escape from the conclusion reached by the trial court, that under this record Miller had an equitable interest in the leases in question and when Kincaid, for his own benefit and without the knowledge or consent of Miller, enriched himself by dealing with these leases, he must be held accountable to his coadventurer Miller.

We must conclude, as did the trial court, that Miller and Kincaid, having acquired the leases in question, continued to own them or at least had an equitable interest in them until they were either surrendered to the government or were divided between the joint adventurers. Mr. Kincaid, under this record, was in no position to deal with the leases in question as his own. If there was any conflict in the testimony due to evidence given by Mr. Kincaid, when he claimed he was the agent for Bay Petroleum in disposing of the Buffalo-043483 lease, these conflicts were resolved by the trial court in favor of plaintiff. The trial court specifically found that Mr. Kincaid "was not acting as agent or representative of Bay."

The judgment and decree is affirmed.

MR. JUSTICE MOORE not participating.