## No. 18,133.

GEORGE W. LINDSAY *v.* SAMUEL M. MARCUS, ET AL.
(325 P. [2d] 267)

Decided May 5, 1958.   Rehearing denied May 26, 1958.

Messrs. KNOWLES & SHAW, for plaintiff in error.

Mr. CHARLES D. BROMLEY, for defendants in error.

*En Banc.*

MR. JUSTICE SUTTON delivered the opinion of the Court.

THE parties appeared in the trial court in reverse order of their appearance here. We will refer to them herein as they there appeared or by name.

On July 25, 1954, at Holland's home in Denver these parties entered into a written agreement designated therein as a "joint venture agreement for the purchase of real estate as tenants in common." The particular land described therein desired to be purchased was described as having been, or, to be, taken under option. The agreement inter alia provided: "* * * to purchase 375 acres of land, more or less, in Sections 27, 28 and 34,

Township 4, SR 67 W of 6 PM in Araphoe County, Colorado, known as the Painter Hereford Company ranch, for the purpose of investment and for subdivision and sale in the future, as may be hereafter decided by mutual agreement, and Whereas, George W. Lindsay is to take the option and subsequent title in his personal name from the owner at a purchase price of $125,000;

"Now, therefore, it is agreed:

"George W. Lindsay shall and he does hereby agree to hold said option and title to said property when acquired, in trust for himself, Samuel M. Marcus and Fred N. Holland, each to own an undivided one-third interest from the date of acquisition;".

The agreement sets forth that Lindsay and Marcus were each to contribute $66,000.00 and Holland his note for $44,000.00 payable to Lindsay and Marcus; the $7,000.00 difference between the $125,000.00 price and the $132,000.00 contributed was to be used for working capital.

Each of the parties was to "exert and contribute his best efforts to accomplish the best results for said venture, devoting as far as possible such of his time as may be necessary; Fred N. Holland shall keep a record of all transactions * * *; none of the parties shall, except upon approval of both other parties receive any salary or compensation for his services, except in the net profits of the venture." There is ample evidence that an understanding existed between Lindsay and Holland that Holland was to share in the transaction if he secured someone to join in the purchase and put up some of the money. This was done when he prevailed on Marcus to participate, culminating in the meeting at Holland's home on July 25, 1954. On that date Lindsay came to Holland's residence about fifteen minutes before the appointed time and was given a copy of the proposed contract to read. Later Holland read it aloud to Lindsay and Marcus and the parties made a few changes and insertions therein, following which it was signed.

Through error the total sum to be advanced of $132,000.00 had been inserted in the blank provided for sums to be advanced by each Lindsay and Marcus. A few minutes after the meeting Lindsay returned and called the error to Holland's attention and the correct figure of $66,000.00 was then written in on Lindsay's copy.

The reference to the option in the agreement was to an option signed only by the seller, secured a few days previously by Lindsay, which instrument covered only surface rights. This required that action be taken to secure the mineral rights or at least protection of the surface rights if the property was to be used for subdivision purposes.

This reservation in the option resulted in the following chain of events according to the record before us: Lindsay and Holland saw Pritchard, the seller, on July 26th and presented an amended option form which Lindsay signed and left with the seller with his check for $5,000.00. Holland had prepared this instrument as he had the original joint venture agreement. Pritchard had his attorney examine this and decided to reject it, which was done by letter on July 27th. Lindsay now contends that this terminated the joint venture and that thereafter he was free to deal with Pritchard solely on his own account. The record shows he proceeded accordingly, for on July 28th he contacted Pritchard and said he was willing to go through with the original option. It then developed that the property could still be bought and that the seller was willing to let his attorney and Lindsay work out the surface vs. subsurface rights problem. This was done with Holland doing the work ostensibly for Lindsay since it had been agreed that no disclosure of Holland's or Marcus' interests would be made.

On August 7, 1954, Lindsay, Holland and Marcus again inspected the property. On August 11, 1954, the purchase was completed with Lindsay taking title in

his own name and subsequently claiming it was for his sole account.

The record discloses several tenders of both Holland's note and Marcus' check, made up to and following the closing, but prior to completion of the sale Lindsay held them off by saying to wait or that there was no hurry. When Lindsay finally said on August 19th that he had repudiated the agreement of July 25th, Marcus and Holland brought suit for specific performance. Lindsay's answer alleged that his signature to the contract was "procured by fraud and overreaching on the part of the plaintiffs and that he did not agree to the terms set out in said instrument and that the same is not an agreement." Other defenses and denials were plead and an assertion made that Holland was "his friend and attorney" and urged him to sign the agreement which he did "in reliance upon the assurances of plaintiff Holland and under a mistake as to the contents of said instrument." Lindsay alleged he only "glanced at the instrument" and that "he did not read it through nor study the terms thereof."

Trial was to the court with an advisory jury — later discharged — which on the disputed and conflicting evidence found in favor of plaintiffs and entered its judgment and decree accordingly, and dismissed defendant's counterclaim to quiet title in himself to the land involved. The decree stated that Lindsay holds the real property in question and any equipment and personal property used in connection therewith in trust for the benefit of the three joint adventurers, in accordance with the written agreement of July 25, 1954. It also ordered an accounting; that Holland's note be delivered to Lindsay to be used per the contract, and that Marcus within ten days pay his $66,000.00 to Lindsay; other parts of the decree otherwise adjusted the equities between the parties.

Motion for new trial was dispensed with and defendant is here by writ of error.

The predicament of these parties is not an uncommon one. The record discloses that an experienced and successful businessman and rancher, Lindsay, was dealing with a neighborhood friend (and his occasional attorney) in a land promotion matter. The evidence is that discussion concerning the possible purchase began in 1953 when Lindsay mentioned it to his neighbor; also that Holland had imaginative ideas about what could be done with the land and that this evolved into the written agreement of July 25, 1954.

Equity holds each joint adventurer strictly accountable for completing ventures and will not permit the unilateral withdrawal of one partner to the detriment of his fellow contractors without the consent of the latter. *Kincaid v. Miller,* 129 Colo. 552, 272 P. (2d) 276; *Smaller v. Leach,* 136 Colo. 297, 316 P. (2d) 1030. In the instant case there was no such consent. It is common knowledge that contracts such as this are often entered into for the promotion of land or other businesses and they need not be more specific than this one was. In fact future details are rarely spelled out in such agreements. *San Francisco Iron & Metal Co. v. American Milling & Industrial Co.,* (1931), 115 Cal. App. 238, 1 P. (2d) 1008.

In the Kincaid case supra the court in this connection stated: (Page 565.)

"Defendant contended that there was no proof of joint venture and that no written agreement had been established. The Supreme Court of Wyoming (in *Wyoming-Indiana Oil & Gas Co. v. Weston,* 43 Wyo. 526, 7 P. (2d) 206) disposed of that contention by quoting from *Goss v. Lanin,* 170 Iowa 57, 152 N.W. 43, the following: 'It is true that it is not necessary that there should be a specific formal agreement to enter into a joint enterprise, or that the interests of the parties should be definitely settled in such agreement, or that there should be a formal agreement as to sharing in the profits. If there be a joint enterprise proven, either by direct evi-

dence of a mutual agreement to that end or by proof of facts and circumstances from which it is made to appear that such enterprise was in fact entered into, the law fixes their rights.'

"In *Wyoming-Indiana Oil & Gas Co. v. Weston,* 43 Wyo. 526, 7 P. (2d) 206, it was contended, as here, that the joint adventure had ceased to exist because no legal rights of renewal existed as to any of the leases involved. The court disposed of this contention in the following language: 'But this argument lays out of view both the underlying agreement of joint adventure proven, whereby the parties were to share proportionately in profits resulting from their procurement of new leases on the state land involved over a period of years, and the legal duty resting on co-adventurers of preserving the utmost good faith in their dealings with each other * * *.'"

Also in the Kincaid case the court said at page 562:

"[1]   One of the leading cases on the law pertaining to joint adventurers is that of *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545. In that case Mr. Chief Justice Cardozo, speaking for the Court, said: 'Joint adventurers, like co-partners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions *(Wendt v. Fisher,* 243, N.Y. 439, 444 [154 N.E. 303]). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.' "

The Colorado Court then continued:

"[2] It is the general rule that until the joint adventure has terminated, or the enterprise has been abandoned, a joint adventurer cannot exclude his associates from an interest in the property by purchasing it for his individual account; neither can he acquire for his individual benefit an interest therein antagonistic to the interest which he acquires for his associate. If he does so purchase or acquire the property in breach of his duty he must account therefor to his joint adventurer.

"[3] In *Austin v. Stephen,* 89 Colo. 177, 300 Pac 364, and *Hanson v. Chamberlin,* 76 Colo. 562, 233 Pac. 830, our Court held that where the title to property acquired in connection with a joint adventure is in the name of one of the parties, he holds it in trust for his associates.

"[4] Joint adventurers stand in a close relationship of trust and confidence and are bound by the same standards of good conduct and square dealing as are required of partners. Each party to a joint adventure has the right to demand and expect from his associates full, fair, open and honest disclosure of everything affecting the relationship. *Moe v. Lowry,* 69 Colo. 371, 194 Pac. 363.

"[5] Without the consent of his associates no member of a joint adventure may so act that his personal interest is hostile to the interest of another member thereof, so long as the joint adventure continues."

█ It is the rule of equity that but slight evidence sustains a claim that a fiduciary has failed in the performance of his obligations to his principal. *Kincaid v. Miller,* supra. Here the evidence is adequate to sustain the finding that Lindsay failed in his duty to his co-adventurers.

█ A joint adventure is consummated when the minds of the parties meet and their mutual promises are exchanged. The fact that one of the parties puts up no **actual cash makes no difference.** When no time limit is expressed by the parties for the performance of the

joint adventure, the agreement remains in effect until the object is consummated, or cannot be accomplished, or is thoroughly impracticable, or until the parties mutually agree to a dissolution. Until the venture is so terminated none of the parties can proceed on his own account. *San Francisco Iron & Metal Co. v. American Milling,* supra; *Pownall v. Cearfoss,* 129 W. Va. 487, 40 S.E. 2d 886.

■ The fact that Lindsay and the Hollands had been neighbors since 1939, that Holland had examined a few abstracts over a thirteen-year period and drawn two wills for Mr. and Mrs. Lindsay made it logical that trust and confidence should exist between the two families. It did not mean that Holland could not enter into a completely separate business transaction with his former client. The record discloses $150.00 in fees paid to Holland over the years and that he made no charge for hastily drawn wills, drafted one time prior to a trip to Hawaii that the Lindsays were taking. Even naming Holland as Executor and Trustee in their wills indicates their confidence in him. Lindsay, however, seems to regard such confidence as being a one-sided affair, overlooking his own duties and obligations. The trust and confidence required here of all parties is one of mutuality; of fair and honest dealing in a business matter; one upon which Holland as well as Lindsay had the right to rely. Lindsay, not Holland, has breached that duty according to this record. And Holland, even though he may have been willing to drop the matter in order to preserve a state of neighborly tranquility, had a further duty to Marcus which, however disagreeable the publicity of an action such as this might be, or whatever its social consequences, required him to stand by Marcus and to take such steps as were necessary to protect and preserve his rights.

■ Business dealings between attorneys and their clients are generally subject to searching scrutiny, but when fair, are upheld as other contracts. *Tatom v.*

*White,* (1886), 95 N.C. 453. Transactions between a former client and his attorney, not involving the relationship of attorney and client, (as here) need not be so rigorously examined, for in the absence of special circumstances, not present in this case, no fiduciary relationship exists.

██ It stretches the credulity of this court to the point of breaking to assert that after a prearranged conference, the reading of the joint venture agreement by each of the parties, the later reading of it out loud by Holland, and the making of agreed alterations to it, that anyone of three participants should assert that he did not understand it. There is no express evidence here that Lindsay had employed Holland as his attorney to represent him in this transaction or that he ever paid or agreed to pay him anything for his work in connection therewith. Defendant had the burden of showing that the relationship of attorney and client existed, this he failed to do. *Moore v. Hoar* (1938), 27 Cal. App. 2d 269, 81 P. (2d) 226, 236. In the absence of fraud no person is excused from reading an agreement, nor can he say that he failed to understand it by showing that the other party was a lawyer who in the past had performed services as such for him. We cite with approval from *Masters v. Elder* (1950), 407 Ill. 512, 95 N.E. 2d 360 where the court said:

"The relation of attorney and client is a confidential one which creates a fiduciary relation between the parties with respect to the matter in which the attorney is acting for the client. However, the relation of attorney and client does not forbid the parties from dealing with each other, * * *. (Here) The relation of attorney and client had not been of a continuous nature previously, but consisted of occasional and isolated transaction(s) of the type narrated above, and not of a continuing character, such as an annual or other retainer. * * *"

. To the same effect are many other authorities relating to fiduciaries, including: *Isaacs v. Okin,* 331 Ill. App.

268, 73 N.E. 2d 11; *Sanford v. Flint,* 108 Minn. 399, 122 N.W. 315; *Harrison v. Murphey,* 39 Okla. 548, 135 Pac. 1137.

Lindsay also urges that the type of action brought which is captioned "Complaint For Specific Performance" is erroneous and cannot be sustained. The prayer of the complaint is:

"WHEREFORE, plaintiffs pray judgment in favor of the plaintiffs and against the defendant, ordering and directing said defendant to comply with the provisions of the agreement dated July 25, 1954, decreeing that he holds title in trust for the parties to said agreement and declaring that each of the parties to said agreement owns an undivided one-third interest in and to said property subject to compliance with the requirements thereof, for costs of this action and for such other relief as to the Court seems proper in the premises."

We think the complaint and its prayer is sufficient to permit the trial court to decree a constructive trust by way of specific performance as well as to order an accounting and such other relief as is necessary to adjust the equitable rights of the parties. See *Gregg v. Green,* 95 Colo. 255, 35 P. (2d) 495; *Hanson v. Chamberlin,* 76 Colo. 562, 233 Pac. 830; *Pepper v. Hyman,* 117 Colo. 365, 189 P. (2d) 155; *Hagerman v. Schulte,* 349 Ill. 11, 181 N.E. 677.

The agreement of these parties is clear and unambiguous, each of their rights and obligations are spelled out as far as was necessary to perform the acts of acquiring and preparing to develop the land. It was not a loan agreement or a contract for services void for lack of mutuality as is asserted by Lindsay. To contend here that the equitable enforcement of this instrument fails to do equity or writes a new contract for the parties is to disregard the ample evidence sustaining the findings of the trial court. Nor does the evidence support the contention that it was terminated, as defendant asserts,

so that he could proceed on his own — in fact it is quite the contrary.

■ We have held too often to require the citation of authority, that when a case is tried to the court and there is adequate evidence to support the findings and judgment of the trial court, it will not be disturbed on review. This is clearly such a case.

Other alleged errors have been assigned by Lindsay dealing principally with evidence admitted or rejected at the trial. We have examined these grounds carefully and find no error committed thereon.

The judgment is affirmed.