Charles H. MORRISON, Respondent,

v.

Victor H. CASPERSEN, Individually and as Officer of Fre-Zert, Inc., and Vix Ice Cream Company; John B. Caspersen, Individually and as Officer of Fre-Zert, Inc., and Vix Ice Cream Company; Ervin O. Lenzen, Individually and as Officer of Fre-Zert, Inc., and Vix Ice Cream Company; Fre-Zert, Inc., a Missouri Corporation; and Vix Ice Cream Company, a Missouri Corporation, Appellants.

No. 46908.

Supreme Court of Missouri,

Division No. 1.

March 9, 1959.

Motion for Rehearing, Correction of Opinion or to Transfer to Court en Banc Denied April 13, 1959.

Fred Armstrong, F. G. Armstrong, St. Louis, for appellants.

J. Leonard Schermer, Gerhard J. Petzall, St. Louis, Shifrin, Treiman, Agat-

stein & Schermer, St. Louis, of counsel, for respondent.

COIL, Commissioner.

For a number of years Mr. Victor H. Caspersen, doing business as Vix Ice Cream Company, manufactured and sold ice cream in St. Louis. Some time prior to 1951 he developed a formula for an imitation ice cream which he called Fre-Zert and which contained vegetable instead of butter fat. In July 1951 Victor's son, John, and his son-in-law, Ervin O. Lenzen, formed Fre-Zert, Inc., a corporation, to manufacture and sell frozen desserts at wholesale through licensees. Victor and Ervin each owned 17 shares of the capital stock. Fre-Zert, Inc.'s operation consisted of licensing various dealers, including Vix, whereby the licensee obtained the formula for Fre-Zert and the right to use the name, and agreed to purchase from the company certain advertising material and cartons for packaging. Vix Ice Cream Company, as licensee in the metropolitan St. Louis area, sold Fre-Zert through retail outlets.

In January 1952 Mr. Victor Caspersen discussed with respondent Charles H. Morrison, who was an experienced salesman, the matter of Morrison joining in the project of manufacturing and distributing Fre-Zert which, because of its low price, was in great demand. As a result, respondent left his employment at Meyer Blanke Company and he and appellants Victor, John, Ervin, Fre-Zert, Inc., and Vix Ice Cream Company entered into a written agreement dated April 1, 1952, as supplemented in one respect by a further agreement dated May 5, 1952.

The agreement, as supplemented, provided that Victor had conveyed to Vix Ice Cream Company, a proposed corporation (then being organized and which was authorized to commence business on April 29, 1952), the assets and liabilities of his individual business (Vix Ice Cream Company) at an agreed value of $40,000. In exchange for the $40,000 thus contributed by Victor,

Vix corporation was to and did issue to him 400 shares of $100 par value capital stock. John, Ervin, and Morrison each agreed to and did purchase from Victor for $15,000 100 shares of the 400 shares theretofore issued to him. In payment each delivered his $15,000 note to Victor dated April 1, 1952, and due in five years at 3 per cent interest. The payment of each note was secured by a pledge of the respective 100 shares of stock. Fre-Zert, Inc. declared a stock dividend of six shares to each of its stockholders, Victor, John, and Ervin, who, in turn, pooled those 18 shares, retired one into the company treasury, and sold the remaining 17 to respondent for $5,000 for which respondent delivered his note for $5,000 to Victor, John, and Ervin jointly. That note was also dated April 1, 1952, and was due in five years at 3 per cent interest, and the 17 shares were pledged to secure payment. Thus and thereby the four named individuals became equal shareholders in both corporations.

The agreement further provided that John, Ervin, and Morrison were to devote their full time to the businesses of Vix and Fre-Zert and that they might draw from either corporation, or partly from both, a total of $100 per week for living expenses and that such amount might "be altered from time to time by unanimous consent of the parties to this Agreement," and, further, that "Any amount in excess of the drawing account to which they may become entitled from either corporation, whether as salary or as dividends, shall be paid to Victor H. Caspersen and applied on their several notes until they are paid in full, if they are so paid prior to maturity."

The agreement contained a paragraph providing that the survivors might take over the interest of a shareholder upon his death or withdrawal "from this undertaking, for reasons which are in a legal sense beyond his control, as death is beyond his control, * * *." And it was also provided that "Any certificates of stock issued

in lieu of the certificates issued as herein expressly provided shall bear the legend 'issued subject to the terms and conditions of an agreement of April 1, 1952, between the corporation and all of its then stockholders.' "

The parties agree that they operated under and pursuant to the terms of that agreement and that it was their intention that Morrison should thereby share equally with John and Ervin as to shares held, drawing account, and salary. Also there is no dispute among the parties that it was intended and understood by all of them that in the conduct of the two corporations the primary duty of respondent was to be sales through Vix, that John Caspersen was to be primarily concerned with the production and packaging of Fre-Zert, and that Ervin Lenzen was to look after the operation of Fre-Zert, Inc. It was agreed, however, that the three, particularly in the early stages of the businesses, were to do and did whatever was necessary in connection with either operation. Likewise, there is no dispute about the fact that respondent executed the two notes above described, that nothing has been paid thereon, and that those notes and the pledged stock are now held by the respective payees, and that the present suit, instituted two or three days prior to the due dates of the notes, caused appellant payees to take no action with respect to the notes or the pledged stock except to seek affirmative equitable relief in this proceeding.

Respondent testified that he diligently performed his duties and that through his efforts the sales of Vix increased, despite the fact that competition became keen during his 22-months' effort. He agreed, however, that things did not continue harmoniously, primarily because of differences of opinion which developed relating to the purchase of ice cream cabinets. It appeared that to successfully distribute Fre-Zert, it was necessary to furnish each outlet with an ice cream cabinet which, depending on size, cost $300 to $700. The purchase orders for such cabinets had to be signed by the officers, who were John Caspersen, Lenzen, and Morrison. A difference of opinion developed as to the number of cabinets that should be purchased; respondent wanted to buy as many as needed; the other officers agreed that cabinets were necessary and that the company should buy them in as great quantities as practicable, but contended that all available funds should not be spent for them to the exclusion of other needed items.

Respondent testified further that the quality of his work was not the subject of criticism directed to him, and that he worked daily with few exceptions. Nevertheless, respondent said that near the end of January 1954, Victor, John, and Ervin, without warning, asked him to resign, he refused to do so, and they discharged him. The next day or shortly thereafter formal meetings of the directors of the two corporations were held and the fact of the discharge was entered in the minutes. Significantly, respondent testified, "We had quarreled * * * let me put it this way: We had quarreled, and anyone could imply from the friction that we had that something had to give eventually. No one, including myself, could see no one else pulling out of the company but me."

Individual appellants related a different version of the events leading to the time of Morrison's discharge, in that they described his intermittent moodiness, his absences from work without explanation, his occasional misconduct in the presence of other employees, his refusal to properly handle the distribution of Minute Maid orange juice which Vix had taken on during Morrison's tenure and, by reason of such failure, had to abandon, and they described their numerous efforts to obtain Morrison's cooperation which preceded his discharge.

By and large, however, it is a fair conclusion from all of the testimony that without the certain fault of anyone, a situation developed which made it wholly undesirable from the standpoint of all for respondent

and individual appellants to continue as fellow employees or as corporate officers jointly contributing their personal efforts to the businesses.

We have referred to the minutes of the meetings of the directors of each corporation on February 1, 1954. Those meetings were attended by respondent and the form and contents of those minutes were known to him because his then attorney at his direction required that they be rewritten to correctly reflect the facts from his standpoint. Those minutes (the same for each corporation) were, in pertinent part:

"It was announced that the other directors had determined to terminate the active connection of Charles H. Morrison with the company. He was thereupon asked whether he preferred to tender his resignation as an officer and director or to have the directors discharge him. He replied that he did not want the record to show that he resigned and that he was attending the meeting only to object. Thereupon, by agreement of directors V. H. Caspersen, J. B. Caspersen, Ervin O. Lenzen and Fred Armstrong, Charles H. Morrison objecting, Charles H. Morrison was discharged as vice president and sales manager and as a paid employee of the company. Director Armstrong then explained the situation as intended by the action taken. It was said that his discharge did not terminate Charles H. Morrison's stock interest in the company and that the company did not know whether or not he wanted to do anything about that interest. He could either dispose of it or keep it. It was stated that if he wanted to dispose of it to the company or to the other stockholders, Fred Armstrong would be glad to talk with him about the matter." Mr. Armstrong was the company attorney.

It is not entirely clear but it seems that intermittent unsuccessful negotiations looking toward the acquisition of respondent's "interest" in the companies went on from February 1, 1954, until the present suit was instituted March 29, 1957.

Respondent's amended petition sought an accounting on the theory that respondent and appellants were joint adventurers. Appellants by their cross claim sought the foreclosure of the pledged stock and a judgment against respondent for their respective deficiencies, if any. The trial chancellor entered no findings of fact or conclusions of law but apparently the decree adopted respondent's theory that there was a joint venture for a 5-year period, i. e., from the execution until the due dates of the notes, and that appellants should render an accounting for that period.

Respondent contends here that he and individual appellants were joint adventurers who had agreed to use appellant corporations as the instruments through which the individuals would accomplish the joint venture purposes, and that the written agreement properly construed provided that the venture was to continue for five years.

Appellants' theory below and here is that the agreement of April 1, 1952, did not make the parties joint adventurers but was a contract whereby four individuals each acquired an equal stock interest in two corporations and whereby three of them became corporate officers and employees for indefinite terms, and that such employment was terminable at the will of the corporation.

Whether the April 1st written agreement, construed in the light of all the circumstances in evidence, is one providing for a joint venture or whether it is simply a contract among the parties to act jointly to achieve an economic objective is a close question. We think it is entirely clear, however, that irrespective of whether the agreement was or was not one providing for a joint venture, there is no reasonable basis for respondent's contention that the term or duration of the arrangement was five years. As we have stated, the notes given, in one instance by John, Ervin, and Morrison to Victor Caspersen and, in the other, by Morrison to the other three jointly, were dated April 1, 1952, and due five

years thereafter. Respondent argues that ipso facto the term of the venture was five years. It seems apparent to us that the due dates of the notes had nothing to do with the termination of whatever arrangement was created by the written agreement. The notes were simply the manner in which Morrison and the others paid for the stock they received. It was, for present purposes, the same as though $20,000 cash had been paid by respondent for the shares of Vix and Fre-Zert. We see no logical connection between the due dates of the notes and the term of the contractual arrangement.

Putting aside temporarily the question of the duration of the arrangement, we note that the instant contract contains expressions, heretofore quoted, indicating that perhaps the parties intended to create a relationship in the nature of a joint adventure. Witness, for example, the reference to the withdrawal of one of the four individuals "from this undertaking," and the reference to the fact that any change in the $100-per-week drawing account needed to be unanimously approved by "the parties to this Agreement," and the fact that future shares issued by the corporations would be subject to agreement between the corporation and its stockholders.

■ Indicating a contrary intent, however, is the fact that the agreement, whatever its label, provided for the continuous operation of two perpetual charter general business corporations indefinitely; certainly not a usual characteristic of a joint adventure agreement. It has been repeatedly held that generally a joint venture is a combination for a specific venture; that is, one involving a single undertaking, a particular venture, as opposed to the operation of a general business for an indefinite period. Shafer v. Southwestern Bell Telephone Co., Mo., 295 S.W.2d 109, 116[13–15]; Gales v. Weldon, Mo., 282 S.W.2d 522, 527[3]; Fuller v. Laws, 219 Mo.App., 342, 271 S.W. 836, 840; United States v.

Standard Oil Co. of California, D.C.S.D. N.Y., 155 F.Supp. 121, 148 [6–8] [9]; Spencer Kellogg & Sons, Inc. v. Lobban, Tenn. Sup., 315 S.W.2d 514, 520[15]. As an apparent exception to the usual rule, see Brooks v. Brooks, 357 Mo. 343, 208 S.W. 2d 279, 4 A.L.R.2d 826.

It also seems apparent that the question of whether a given arrangement is a joint venture is complicated further when corporations enter the picture. It has been said that parties may not operate as joint adventurers where they have adopted a corporate form, i. e., the two are mutually exclusive; that those who adopt the corporate form and shield may not be "partners *inter sese* and a corporation as to the rest of the world." Weisman v. Awnair Corp. of America, 3 N.Y.2d 444, 165 N.Y.S.2d 745, 144 N.E.2d 415, 418; United States v. Standard Oil Co. of California, supra, and cases and texts there cited.

To the contrary, however, is the view that the fact of the organization or existence of a corporation in connection with an alleged joint adventure does not destroy the fact of the existence of the joint venture if it is shown that the intent of the parties was to use the corporation as an instrument or medium for the accomplishment of the joint venture purposes. Tate v. Ballard, 243 Minn. 353, 68 N.W.2d 261; De Boy v. Harris, 207 Md. 212, 113 A.2d 903, 906[1], 907[2]; United States v. Standard Oil Co. of California, supra, and cases there cited; Lewis & Co. v. Radford, Ky., 257 S.W.2d 56, 58[1].

Because the instant agreement contemplated the continuous operation of general businesses indefinitely and because it is doubtful that respondent sustained his burden to show by a preponderance of the evidence, Peterson v. Massey, 155 Neb. 829, 53 N.W.2d 912, 916[11], that instant corporations were in fact instruments to carry out the alleged joint venture agreement as opposed to the proposition that the corporate forms denoted the actual nature of the association of the parties, we should be

inclined to hold that respondent has failed to prove the existence of a joint adventure.

In the view we take of the case, however, it appears to be unnecessary to reach a positive conclusion in that respect because, as we see it, whether the agreement is considered as one providing for a joint adventure or whether it was simply an agreement creating certain contractual rights, the relief to which the parties are entitled is the same.

If there was no joint adventure, it nevertheless seems reasonable to say that the agreement construed in the light of its background contemplated that the three named stockholders would not only have equal stock interests but would, as an integral part of the arrangement, personally participate in the conduct of the businesses. And it appears that the parties demonstrated that they so construed their arrangement when respondent's employment was terminated. That understanding was indicated by the minutes of the directors' meeting heretofore quoted. Implicit therein is the idea that respondent could consider the entire undertaking at an end. It is true that he was given an option to retain his stock and thereafter occupy the role of a minority stockholder, and it is true that no terms were fixed for the surrender of his stock in the event he desired to treat the entire arrangement as terminating as of February 1, 1954. But it seems clear that it was implied in the agreement that upon the forced cessation of one's personal services, that one could treat the entire undertaking at an end and have a settlement of his whole interest as of that date.

■ If we are mistaken in our tentative conclusion that no joint venture was shown and if, therefore, we assume that the arrangement among the parties did constitute a joint venture, the settlement or accounting date is the same. Ordinarily an agreement providing for a joint adventure which fixes no specific termination date either expressly or by necessary implication remains in effect until the purpose of the agreement is accomplished or until it is ascertained that the purpose cannot be accomplished. Dierks & Sons Lumber Co. v. Bruce, Mo., 239 S.W. 133, 135[2]; Pownall v. Cearfoss, 129 W.Va. 487, 40 S.E.2d 886, 894 [7]; Air Purification, Inc. v. Carle, 99 Cal. App.2d 258, 221 P.2d 700, 704[6]; Lindsay v. Marcus, Colo., 325 P.2d 267, 271[5,6]. Where, however, the joint venture agreement which fixes no specific termination date is a contract for the continuing operation of a general business for an indefinite period, the joint venture should be and usually is terminable at the will of any party to that agreement. Dugan v. Pettijohn, 134 Cal.App.2d 133, 285 P.2d 339, 342[6,7]; Upper Penns Neck Tp., Salem County v. Lower Penns Neck Tp., 20 N.J.Super. 280, 89 A.2d 727, 732[5-7]; 48 C.J.S. Joint Adventures § 4, pp. 820, 821.

In Daily States Pub. Co. v. Uhalt, 169 La. 893, 126 So. 228, 231, 232, the court well expressed the latter rule: "It may be conceded, for the purposes of this case, that the facts herein disclose the formation of a joint adventure. If we so regard the facts, nevertheless it would seem that the arrangement made was one terminable on the giving of notice. It may be perceived readily that an association formed for the accomplishment of a single transaction is intended, from its very nature, to continue until the transaction is accomplished and terminates upon the accomplishment of the transaction. Here, however, the business to be conducted is of a continuing nature, with no end in sight until, for some cause, the operation of the station or the newspaper ceases. Moreover, the relation established involves the performance by each party of a number of obligations, the manner of discharging which may be fruitful of dissatisfaction. In these circumstances it should be held, we think, that the relation established may be terminated on the giving of reasonable notice. Certainly, were the relation here established

treated as a partnership, it would be terminable on the giving of reasonable notice, and we see no reason why the rules of law applicable to the duration of partnerships should not be applicable to the duration of the relation of joint adventurers."

■ We hold, therefore, that if it be assumed that there was a contract providing for a joint venture among respondent and appellants, such was terminable at the will of any party to that contract and that appellants terminated the joint adventure, at least in so far as concerned respondent's continuing right to have employment and to share equally in remuneration for such employment, prior to and as of February 1, 1954.

It follows that under either theory respondent is entitled to an accounting as of February 1, 1954.

There was evidence that salaries of $750 per month were voted John Caspersen, Ervin Lenzen, and respondent Morrison for the period from April 1, 1952, to April 1, 1953. Each of those parties received $5,200 ($100 per week) and $3,000 in addition for that period. The $3,000 was represented by a check issued to each and endorsed by each to the company as a loan. It is admitted that the company owes plaintiff that $3,000 which, under the terms of the agreement, was to be credited on the $15,000 note given to Victor Caspersen. Thus, Morrison, John, and Ervin each received for the year (April 1952–April 1953) $8,200 of the $9,000 due, leaving $800, in addition to the $3,000, due plaintiff for that period.

The evidence showed that after respondent left the companies, Fre-Zert paid John Caspersen and Ervin Lenzen each a total of $6,000 as salary for the fiscal year ending July 31, 1954, and that Vix paid John and Ervin each $5,200 as salary for the fiscal year ending March 31, 1954. John and Ervin, therefore, each received salary at the rate of $933.34 per month during the 10 months preceding February 1954, during which period Morrison was to have received salary at an equal rate. Thus Morrison, for the 10 months from April 1, 1953, to February 1, 1954, was entitled to receive $9,333.40. He received $4,350 ($100 per week for 43½ weeks) so that as of January 31, 1954, there was due respondent $4,983.40 as salary for the period April 1, 1953, to January 31, 1954.

It follows that if respondent elects, as hereinafter provided, to pay the principal and interest (to the due date of the notes) due on his notes and thereby pay for his stock in the respective corporations and remain a stockholder, he is entitled to receive from the two corporations jointly the total of $8,783.40 ($3,000 plus $800 plus $4,983.40) as a credit to be applied on the note to Victor Caspersen.

If respondent elects to have an accounting as of January 31, 1954, covering what is due him by virtue of his stock interest as well as what is due him by virtue of salary, then the amount due respondent is (in addition to the amount noted above as salary) one fourth of the amount of issued capital stock and one fourth of all surplus accounts as reflected by balance sheets to be prepared for each corporation to reflect its status, in accordance with its usual accounting practices prior thereto, as of January 31, 1954. In the event, however, that such an accounting is made, the balance sheets so prepared would properly reflect not only the $3,000 payment to each John B. Caspersen, Ervin Lenzen, and respondent, but an additional payment of $800 to each for the period ending April 1, 1953, and would reflect a payment of $4,983.40 (in addition to $100-per-month drawing accounts) to each of those three individuals for the period from April 1, 1953, to February 1, 1954.

When it has been determined what amount respondent is entitled to receive in the event of the accounting above described (i. e., the value of his stock plus the

amount of salary indicated) if that amount, whether due from Vix or Fre-Zert, Inc., or both, is in excess of the amount due on the two notes, then the amount due on such notes should be credited against the respective amount due respondent.

It follows that upon remand of this case the trial chancellor should enter his order making provision for the following:

Respondent shall file in the trial court within 30 days following the date the mandate herein is filed in that court, his election stating which of the alternative accountings (heretofore described) he desires. In the event respondent elects to pay for the stock in question the amount due on each of the notes, less the salary credit on the note to Victor Caspersen, then as a part of and as a condition of his right to make such an election he shall deposit therewith a sum sufficient to pay the total net amounts due on each note; within five days thereafter appellants shall deposit in court a duly issued certificate for 100 shares of the capital stock of Vix Ice Cream Company, a corporation, and a duly issued certificate for 17 shares of the capital stock of Fre-Zert, Inc., a corporation, each of said certificates to be in the name of respondent and each certificate to be free of any restrictive endorsement or pledge or other restriction, together with the two notes hereinabove described marked paid; upon the deposit of the sum above mentioned and of the certificates and notes above described, the money shall be paid to the respective appellants in the proper amounts, respectively, and the described certificates and notes delivered to respondent.

In the event respondent elects to have an accounting fixing the value of his entire interest as of January 31, 1954, he shall file with such election an assignment of certificate 4 for 100 shares of the capital stock of Vix Ice Cream Company, a corporation, to Victor H. Caspersen, and an assignment of certificate 13 for 17 shares of the capital stock of Fre-Zert, Inc., a corporation, to Victor H. Caspersen, John B. Caspersen, and Ervin O. Lenzen. If, when the accounting so elected and heretofore described has been completed, the amount due respondent is in excess of the total owed by respondent on the two notes, such excess amount shall forthwith be paid into court by appellants and paid over to respondent.

In the event respondent fails to file an election as provided, then, and in that event, the accounting as of January 31, 1954, of respondent's entire interest (as hereinbefore described) shall nevertheless proceed and the resulting decree will provide that certificate 4 for 100 shares of capital stock of Vix Ice Cream Company, a corporation, is thereby transferred and assigned to Victor H. Caspersen and that certificate 13 for 17 shares of the capital stock of Fre-Zert, Inc., a corporation, is thereby transferred and assigned to Victor H. Caspersen, John B. Caspersen, and Ervin O. Lenzen.

The costs in the trial court, as well as the costs on this appeal, are assessed one half against respondent and one half against appellants.

The judgment is reversed and the case remanded with directions to proceed in accordance with this opinion.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.