Neal **BATTERMAN**, Clarice Batterman, Garold Batterman, Robert Batterman, and Batterman and Sons, Ltd., a Nebraska corporation, Plaintiffs–Appellants,

v.

**WELLS FARGO AG CREDIT CORP.**, a California corporation, Defendant–Appellee.

No. 89CA0135.

Colorado Court of Appeals, Div. III.

April 19, 1990.

As Modified on Denial of Rehearing June 14, 1990.

Certiorari Denied Dec. 24, 1990.

Carpenter & Johnson, P.C., Craig D. Johnson, Wheat Ridge, and Robert Gibson, Lincoln, Neb., for plaintiffs-appellants.

Montgomery Little Young Campbell & McGrew, P.C., Richard O. Campbell and Debra Piazza, Englewood, for defendant-appellee.

Opinion by Judge TURSI.

In this lender liability action, plaintiffs appeal the summary judgment entered in favor of defendant, Wells Fargo Ag Credit Corporation (Wells Fargo). They maintain that the trial court erred in dismissing: (1) their breach of contract claim on the basis that the parol evidence rule bars evidence of the alleged agreement and that the claim was barred by the statute of limitations; (2) their "adhesion contract" claim as not supporting an award of damages; (3) their intentional interference with contractual obligations claim for failure to prove any damages; (4) their breach of fiduciary duty claim for failure to proffer facts establishing the existence of a fiduciary relationship; and (5) all claims by plaintiffs, Neal and Clarice Batterman, as barred by the doctrine of res judicata. We affirm in part and reverse in part.

Plaintiffs are members of a family once actively engaged in the business of farming and ranching in the state of Nebraska. The parents, Neal and Clarice began the business in 1946 and, by 1977, had built it up to include 3,680 acres of land (Home Place). In 1977, they formed the plaintiff corporation, Batterman & Sons, Ltd. (Corporation), to operate the farm. In so doing, they transferred 2,040 acres of the Home Place to the corporation and they retained ownership of its shares.

In March 1979, their sons, Garold and Robert Batterman purchased 4,800 acres of nearby farmland (Cedar Creek Ranch) under an installment land contract. The purchase price was $1,850,000 and required a $245,000 down payment which Garold and Robert financed through part of the proceeds of a $450,000 loan from Northwestern State Bank.

Shortly after Cedar Creek Ranch was purchased, the plaintiffs began having financial difficulties. The large amount of debt on this property, and the insufficient cash flow, financially drained both the sons and their parents. Eventually, in 1981, Northwestern declared a default on the loan due to non-payment.

To persuade Northwestern to waive the default for six months, the Corporation provided a mortgage on its portion of the Home Place. Cedar Creek Ranch was listed for sale but could not be sold. Additional problems developed when parents' long-time bank terminated their line of credit. Then, in early 1982, Northwestern's loan was again due, and it demanded full repayment and threatened foreclosure proceedings on the Home Place.

Plaintiffs, in search of long-term financing, thereafter contacted Wells Fargo which was financing a number of Nebraska agricultural operations. Wells Fargo's loan policy at the time generally called for financing equipment, land, and carryover debt on terms of five to seven years. They met and discussed their needs with a Wells Fargo loan officer who, after scrutinizing plaintiff's operations, finances, and references, prepared a loan report on May 10, 1982, and recommended loan approval.

In a letter dated May 19, 1982, the loan officer offered plaintiffs a financing package whereby Wells Fargo would provide five distinct business loans to fund various operations and to repay the current portion of certain long term debts. Part of this offer promised a $400,000 term loan which would be payable in $80,000 annual installments, the first becoming due on December 31, 1982. The offer was accepted by plaintiffs on May 21, 1982.

Six days later, a formal written Credit Agreement, five promissory notes, and security instruments, covering the above described loans were provided by Wells Fargo. These documents omitted any reference to five-year financing or payments in annual installments and provided that the term loan was due and payable in full on December 31, 1982. Plaintiffs signed and executed these documents on May 27, 1982.

Later in 1982, Wells Fargo's parent company made a corporate policy decision to cut losses in agricultural financing. As a consequence, it fired certain staff and brought in a new staff to adjust and liquidate agricultural loans. This new staff, after re-evaluating plaintiffs' operations in mid-December, told plaintiffs on January 3, 1983, that their operating line of credit would not be renewed and declared their $400,000 term loan in default because of non-payment of the loan by December 31, 1982.

Eventually, an addendum agreement was entered into and executed on April 29, 1983, reducing the maximum loanable amount from $2,288,794 to $1,655,416, imposing more stringent terms and conditions, and calling for the repayment of all loans on December 31, 1983. Plaintiffs again defaulted on their obligations, and no further financing was provided after December 31, 1983. Subsequently, Wells Fargo forced liquidation of plaintiffs' equipment, inventory, and cattle. Other senior mortgage holders eventually foreclosed on plaintiff's farm and ranch properties.

Plaintiffs filed this action on June 30, 1986. Wells Fargo answered, counterclaimed, and moved for summary judgment on all of plaintiffs' claims. Its motion was granted with respect to all of plaintiffs' claims except those for negligence and exemplary damages. The trial court then entered a C.R.C.P. 54(b) order on the claims disposed of by summary judgment.

I.

The essence of plaintiffs' breach of contract claim was that Wells Fargo had contracted with plaintiffs to provide long term financing for five years and breached this agreement by failing to renew the loans according to the repayment schedule presented to plaintiffs prior to the inception of the May 27, 1982, contracts.

The trial court ruled that: "[P]laintiffs have failed to demonstrate admissible material facts in dispute ... [and] have not demonstrated evidence which would prevent entry of summary judgment." The loan documents were, according to the trial court, clear and unambiguous on their face and provided for full repayment on December 31, 1982. Because there was no basis for introducing extrinsic evidence of the alleged five-year loan life, the trial court granted summary judgment. Plaintiffs contend this ruling was error. We disagree.

As a preliminary matter, we note that under law of merger, prior agreements, covenants, and conversations are merged into the final, formal, written contracts executed by the parties. *See City of Westminster v. Skyline Vista Development Co.,* 163 Colo. 394, 431 P.2d 26 (1967); *Skidmore v. First Bank,* 773 P.2d 587 (Colo.App.1988). Hence, any promises or covenants in the May 19, 1982, letter of commitment to provide long-term financing for five years merged into, and were extinguished by, the parties' final, formal, written agreements executed on May 27, 1982. Accordingly, it is this written agreement we must interpret.

Interpretation of contract language is a question of law which we undertake independent of the trial court's construction. *Robert A. McNeil Corp. v. Paul,* 757 P.2d 165 (Colo.App.1988). We construe together the several documents of the parties' loan agreement, *Cole v. Hotz,* 758 P.2d 679 (Colo.App.1987), examine the language of that agreement, *Radiology Professional Corp. v. Trinidad Area Health Ass'n,* 195 Colo. 253, 577 P.2d 748 (1978), and interpret it in its entirety with the end in view of seeking to harmonize and give effect to all the provisions so that none will be rendered meaningless. *Pepcol Manufacturing Co. v. Denver Union Corp.,* 687 P.2d 1310 (Colo.1984).

After reviewing the parties' agreement pursuant to these principles, we determine that the agreement is complete, clear in its terms, and free from any ambiguity concerning the expiration date of loans. The written loan documents, executed on May 27, 1982, expressly provide that:

"Anything herein to the contrary notwithstanding, all principal and interest

remaining unpaid on December 31, 1982, shall be immediately due and payable."

■ Since the evidence proffered by plaintiffs would, if admitted, directly contradict and vary the express terms of the agreement, we conclude that the trial court correctly excluded from consideration any extrinsic evidence of a five-year financing plan. *See Pepcol Manufacturing Co. v. Denver Union Corp., supra.* In light of this conclusion, it is unnecessary for us to consider the trial court's ruling that the statute of limitations bars plaintiffs' breach of contract claim. *See Olney Springs Drainage District v. Auckland,* 83 Colo. 510, 267 P. 605 (1928).

### II.

Plaintiffs also contend that the trial court erred in dismissing their "breach of adhesion contract" claim as not supporting an award of damages. We perceive no error.

According to plaintiffs, in early 1983 they needed to borrow sufficient operating capital to allow them to farm and ranch throughout the future growing season. Wells Fargo, however, refused to lend them operating capital on the same terms as in 1982. Instead, it insisted on new, more stringent, conditions including: a reduced operating budget; reduced loan amounts; an ultimatum to either refinance the ranch or sell it; and an increased interest rate from 2¼ percent to 3½ percent over prime rate.

Plaintiffs attempted to secure financing from other institutions but were unsuccessful because Wells Fargo had priority security interests in all of the Corporation's assets. Plaintiffs contend that Wells Fargo knew of their special vulnerability and, in effect, gave them the option of commencing immediate liquidation of their assets or accepting Wells Fargo's terms for further financing into 1983. Plaintiffs opted for the latter option and executed the April 29, 1983 addendum.

Plaintiffs maintain that a contract of adhesion may support not only relief from enforcement of the contract, but also an affirmative action for damages. They insist that a contract of adhesion gives rise to certain duties and standards of care in the party who occupies a superior bargaining position. The breach of these duties, they argue, gives rise to a claim for damages. The trial court disagreed and so do we.

■ An adhesion contract is a contract drafted unilaterally by a business enterprise and forced upon an unwilling and often unknowing public for services that cannot be obtained elsewhere. It is generally not bargained for, but is imposed on a take it or leave it basis. *Jones v. Dressel,* 623 P.2d 370 (Colo.1981).

■ The remedies recognized for contracts of adhesion are to treat the contract as unenforceable or to excise from the contract that particular term. The recognized rationales for these remedies are usually stated in terms of unconscionability, violation of public policy, or lack of true assent. *See* J. Calamari & N. Perillo, *Contracts* § 9–44 (3d ed. 1987).

■ Neither these rationales nor any authority cited by plaintiffs justify the imposition of tort liability and accompanying damages on a party to a contract whose only "wrong" was to use its superior bargaining position to protect its investment by requiring protective terms in the contract. Hence, we conclude that the trial court did not err in dismissing plaintiffs' claim alleging a purported contract of adhesion.

### III.

Plaintiffs also argue that the trial court erred in dismissing their claim for relief based on the theory of intentional interference with contractual obligations. Under this theory, they alleged that they had a contract with Midwest Potato Growers Association to grow and sell potatoes. Wells Fargo, they alleged, knew of this contract and intentionally interfered with plaintiffs' ability to perform it by not providing funds to plaintiffs to perform their obligations under the contract, thereby causing the

Midwest Potato Growers Association permanently to terminate the contract.

The trial court found that although there was "an issue of fact as to whether a contract existed which the Defendant intentionally and improperly interfered with," there was no evidence that plaintiffs sustained lost profits or incremental expenses from the alleged interference. Lacking evidence of such damages, it, therefore, granted summary judgment on this claim in favor of defendant. We agree with plaintiffs that this was error.

■ One who is liable to another for interference with a contractual relationship is liable in tort for damages necessary to make the innocent party whole. Damages are not, necessarily, measured by contract rules but may include:

"(a) the pecuniary loss of the benefits of the contract or the prospective relation;

(b) consequential losses for which the interference is a legal cause; and

(c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference."

Restatement (Second) of Torts § 774A(1) (1979); *Westfield Development Co. v. Rifle Investment Associates,* 786 P.2d 1112 (Colo.1990).

■ In this case, there was sufficient, though contested, evidence of damages in the record before the trial court to preclude the entry of summary judgment. Neal Batterman's deposition testimony indicates that Wells Fargo's alleged refusal to advance money budgeted for potato production caused plaintiffs not only to lose profits they would otherwise have realized, but also to lose the value of fertilizer which they had already applied to 260 acres when Wells Fargo allegedly interfered with their contract. Further, the record does not indicate whether the trial court considered the plaintiffs' alleged emotional distress or any actual harm to their reputations as proper damages under this claim.

Accordingly, we conclude that there were genuine issues of material fact before the court on the issue of damages, and the trial court erred in granting summary judgment on this claim. *See* C.R.C.P. 56(c).

## IV.

Plaintiffs next contend that the trial court erred in dismissing their claim for breach of a fiduciary duty which resulted from a joint venture Wells Fargo had created with plaintiffs by investing funds into plaintiffs' operations and controlling all financial aspects of debt and income. In granting summary judgment on this claim, the trial court found that no evidence had been presented to support, directly or inferentially, the proposition that a joint venture relationship was formed. We agree with the trial court.

■ A joint venture is a partnership formed for a limited purpose, and the substantive law of partnership must be applied in determining whether a joint venture exists. *See Hooper v. Yoder,* 737 P.2d 852 (Colo.1987) (fn. 4). A "partnership" is defined as "an association of two or more persons to carry on, as coowners, a business for profit." *See* § 7–60–106(1), C.R.S. (1986 Repl.Vol. 3A).

■ The primary attribute and necessary condition for a partnership is the element of joint, not several, profit sharing. *See Colorado Performance Corp. v. Mariposa Associates,* 754 P.2d 401 (Colo.App. 1987). This element, however, is not present if one of the parties to the alleged joint venture receives a fixed sum, irrespective of the venture's profits or losses, *see Realty Development Co. v. Feit,* 154 Colo. 44, 387 P.2d 898 (1963), or if one of the parties could have enjoyed an individual profit, while the other might have sustained an individual loss. *See Colorado Performance Corp. v. Mariposa Associates, supra.* In either case, absent joint profit sharing, the parties cannot be said to be actual joint venturers.

■ Here, all of the documents forming the parties' agreement indicate that Wells Fargo's financial interest was fixed to a specified amount of interest income, irrespective of plaintiffs' profit or loss. In addition, Wells Fargo's right to interest continued to accrue during the course of the parties' relationship despite the fact

that plaintiffs continued to suffer losses from the farming and ranching business.

Absent evidence of joint profit sharing, there could be no genuine issue of material fact as to the existence of a joint venture and, thus, no recognizable, resulting, fiduciary relationship under this theory. *See Kincaid v. Miller,* 129 Colo. 552, 272 P.2d 276 (1954). We, therefore, conclude that the trial court properly entered summary judgment on this claim. *See* C.R.C.P. 56(c).

## V.

Plaintiffs' final contention is that the trial court erred in dismissing all claims of Neal and Clarice Batterman as barred by the doctrine of res judicata. They argue that the prior Nebraska decision, which dismissed their contract claim for damages because of a lack of standing, was a technical dismissal, not a judgment on the merits, and did not bar the litigation of all other claims that might have been raised but were not. We agree.

The doctrine of res judicata provides that a final judgment on the merits by a court of competent jurisdiction is conclusive of the rights of the parties or their privies in all later suits on points or matters determined in the former suit. *Whitman v. People,* 161 Colo. 117, 420 P.2d 244 (1966). It bars relitigation not only of all issues actually decided, but of all issues that might have been decided. *Pomeroy v. Waitkus,* 183 Colo. 344, 517 P.2d 396 (1973).

For this doctrine to apply to a judgment of dismissal, there must have been final judgment on the merits. *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *Dash v. Rubey,* 144 Colo. 481, 357 P.2d 81 (1960). A judgment based on any preliminary, subsidiary, or technical grounds is not an adjudication upon the merits. *Saunders v. Bankston,* 31 Colo.App. 551, 506 P.2d 1253 (1972). Nor is a judgment dismissing an action or claim for lack of jurisdiction an adjudication on the merits. C.R.C.P. 41(b)(1).

The dismissal of a suit for lack of standing is also not "on the merits" of the underlying substantive claim. *Summerhouse Condominium Ass'n v. Majestic Savings & Loan Ass'n,* 660 P.2d 16 (Colo.App.1982). Rather, standing is an analytical prerequisite to reaching the merits of a suit, *see Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535 (1977), and "ranks amongst those questions of jurisdiction and justiciability not involving an adjudication on the merits, whose disposition will not bar relitigation of the cause of action originally asserted, but may preclude, or collaterally estop, relitigation of the precise issues of jurisdiction adjudicated." *Cutler v. Hayes,* 818 F.2d 879 (D.C.Cir.1987). *See also McCarney v. Ford Motor Co.,* 657 F.2d 230 (8th Cir.1981) (dismissal for lack of standing is not "on the merits" and does not bar a second action on the same claim if justiciability problem can be overcome.)

Prior to the filing of this case, Wells Fargo sued Neal and Clarice Batterman in the Nebraska state courts for liability as guarantors on the promissory notes. They counterclaimed, alleging that Wells Fargo had obligated itself to provide financing for five years but had breached its agreement by failing to provide financing to the corporation for the agreed five-year period, and requested damages for themselves. The trial court granted summary judgment against them on their counterclaim.

This judgment was upheld by the Nebraska Supreme Court on the ground that:

> "Neal and Clarice Batterman, as individuals and shareholders of Batterman & Sons, Ltd., *lacked a legal interest standing to assert a claim against Wells Fargo* for an alleged breach of the financing agreement between Wells Fargo and Batterman & Sons, Ltd. ... [and] *were not entitled to maintain an action against Wells Fargo.*"

*Wells Fargo Ag Credit Corp. v. Batterman,* 229 Neb. 15, 424 N.W.2d 870 (1988) (emphasis added).

Since this decision was based on Neal and Clarice Batterman's lack of standing, it cannot operate as adjudication on the merits. Accordingly, the doctrine of res judicata is inapplicable as a basis for claim preclusion, and the trial court erred in dismissing all of Neal and Clarice Batterman's claims in reliance upon the doctrine.

Nevertheless, Neal and Clarice Batterman still may not have standing to bring the remaining undismissed claims. Because this issue has not been adequately addressed in the pleadings, the briefs, or the trial court's order, we do not decide whether parents have standing. Instead, we remand to the trial court for determination of Neal and Clarice Batterman's status in this action (*i.e.*, as individuals, shareholders, guarantors, etc.) and whether they have standing to bring the remaining claims of intentional interference with contractual relations, negligence, and exemplary damages. *See Wimberly v. Ettenberg, supra.*

The summary judgment is affirmed with respect to plaintiffs' claims for breach of contract, adhesion contract, and breach of fiduciary duty. The trial court's judgment is reversed, and the cause is remanded with respect to plaintiffs' intentional interference with contractual relations claim and the ruling based on res judicata.

METZGER and CRISWELL, JJ., concur.